JERRY FONG, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Fong v. Commissioner
Docket Nos. 7456-76, 7457-76, 7458-76, 7459-76, 7460-76, 7461-76, 7462-76, 7463-76, 7464-76, 7465-76, 7466-76, 7467-76, 7468-76, 7469-76, 7470-76, 7471-76, 7472-76.
United States Tax Court
T.C. Memo 1984-402; 1984 Tax Ct. Memo LEXIS 274; 48 T.C.M. (CCH) 689; T.C.M. (RIA) 84402; July 31, 1984. Edward B. Simpson and Carl M. Stein, for the petitioners. Bryce A. Kranzthor, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' income taxes in the amounts and for the years as follows: Year
Petitioners
Ending
Deficiency
Jerry Fong
12/31/71
$ 429.00
12/31/72
841.00
12/31/73
3,243.00
Art B. Fong
12/31/71
356.00
12/31/72
892.00
12/31/73
9,895.00
Samuel B. Fong
12/31/71
236.00
12/31/72
729.00
12/31/73
9,944.00
Mun Li Fong
12/31/72
14,326.00
12/31/73
32,548.00
Franklin Fong
12/31/71
344.00
12/31/72
1,221.00
12/31/73
9,931.00
Peggy Fong Wong
12/31/72
208.00
Stanley L. Wong and
Peggy Fong Wong
12/31/73
4,101.00
Wanda Fong Toy
12/31/72
339.00
Sammy G. Toy and
Wanda Fong Toy
12/31/73
$3,969.00
Farmers Central
12/31/72
194.00
Market Corp.
12/31/73
69,749.00
Wal Noon Corporation
7/31/73
1,687.00
Lee Yuen Enterprises
(Hong Kong) Limited
3/31/73
50,956.00
Farmers Enterprises,
12/31/70
93.00
Inc.
12/31/71
6,089.39
12/31/72
3,837.95
12/31/73
6,405.96
Farmers Market No. 5,
3/31/70
53,782.00
Inc.
3/31/71
23,025.00
3/31/72
145,078.00
3/31/73
81,473.00
3/31/74
85,489.00
Farmers Market of
3/31/70
64,800.00
Northern California,
3/31/71
612.00
Inc.
3/31/72
216,583.00
3/31/73
198,155.00
3/31/74
205,170.00
Farmers Market of
2/29/72
60,182.00
South Sacramento,
2/28/73
60,780.00
Inc.
2/28/74
69,791.00
Walter Fong and
12/31/72
1,136,566.00
Yee Shee Fong
12/31/73
233,277.00
*277 Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for decision the following: (1)(a) Whether petitioner-corporations Farmers Market of Northern California, Farmers Market No. 5, and Farmers Market of South Sacramento, are entitled under section 162 [2] to deduct as ordinary and necessary business expenses amounts accrued on their corporate books during their respective fiscal years ending in 1972 as credit guarantee fees payable to Walter Fong; (b) If the credit guarantee fees were ordinary and necessary within the meaning of section 162 and were reasonable in amount, whether they properly were accruable under the rules of section 461; (c) In the alternative, if the fees were accrued properly under section 461, whether the attribution rules of section 267 preclude their deductibility; and (d) In the alternative, if petitioner-corporations properly accrued and deducted the fees in 1972, whether Walter Fong constructively received payment of them in 1972. (2) Whether the change made by respondent in the income tax accounting method of Farmers Management Services Co. from the cash basis to an accrual method is justified in *278 order to reflect properly the partnership's income. (3) Whether Farmers Cattle Co. partnership is entitled to deductions for prepaid cattle feed in the amounts of $198,362 and $150,000 in its fiscal years ending March 31, 1973, and March 31, 1974, respectively. (4) Whether "inventory fees" paid by Farmers International Market Corp. in 1972 and by Farmers General Market Corp. in 1973 in the amount of $40,000 per grocery store purchased from Bazar, Inc., and Cal Bazar, Inc., should be capitalized as nonamortizable going-concern value or should be deducted as business expenses under section 162. (5) Whether "special opening" fees paid by Farmers International Market Corp. in 1972 and Farmers General Market Corp. in 1973 in the amount of $15,000 per grocery store purchased from Bazar, Inc., and Cal Bazar, Inc., were currently deductible business expenses or should be capitablized as nonamortizable capital expenditures. (6) Whether interest payments made by Walter Fong in December 1972 and 1973 to Farmers Management Services Co. are includable in the income of that Company in the years of payment or in the following years. (7) Whether Farmers Central Market Corp. is entitled to *279 deduct a fee of $93,000 in 1973 which it accrued in that year as payable to Farmers Cattle Co.
(8) Whether Farmers Central Market Corp. is entitled to deduct in 1973 a $75,000 fee which it accrued in that year as payable to Farmers Management Services Co. (9) Whether Walter Fong should include in his 1972 income a $20,000 demand promissory note made payable to him by Farmers Central Market Corp., and delivered to him by that corporation in 1972. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, Jerry Fong, Art B. Fong, Samuel B. Fong, Mun Li Fong, Franklin Fong, Peggy Fong Wong, Stanley L. Wong, Wanda Fong Toy and Sammy G. Toy resided in Sacramento, California, at the time of filing their petitions. Each of these petitioners filed Federal income tax returns for the years here in issue with the Internal Revenue Service Center, Fresno, California. Petitioner Farmers Central Market Corp. (FCMC), a California corporation incorporated in June 1966, had its principal place of *280 business in Sacramento, California, at the time of filing its petition in this case. FCMC kept its records and filed its income tax returns on an accrual basis for a calendar year. FCMC filed its corporate Federal income tax returns for calendar years 1972 and 1973 with the Internal Revenue Service Center, Fresno, California. Petitioner Wal Noon Corp. (WNC), a California corporation, had its principal place of business in Sacramento, California, at the time of filing its petition in this case. WNC filed its coporate Federal income tax return for its fiscal year ending July 31, 1973, with the Internal Revenue Service Center, Fresno, California. Petitioner Lee Yuen Enterprises, Ltd. (LYE), is a Hong Kong corporation authorized to do business in California. LYE had its principal place of business in Sacramento, California, at the time of filing its petition in this case. [3] LYE kept its records and filed its income tax returns on an accrual basis for a fiscal year ending March 31. LYE filed its Federal income tax return for its fiscal year ending March 31, 1973, with the Internal Revenue Service Center, Fresno, California. *281 Petitioner Farmers Enterprises, Inc. (FE), a California corporation incorporated in January 1969, had its principal place of business in Sacramento, California, at the time of filing its petition in this case. FE kept its records and filed its income tax returns on an accrual basis for each calendar year. FE filed its Federal income tax returns for calendar years 1971, 1972 and 1973 with the Internal Revenue Service Center, Fresno, California. Petitioner Farmers Market No. 5, Inc. (FM No. 5), a California corporation incorporated in September 1958, had its principal place of business in Sacramento, California, at the time of filing its petition in this case. FM No. 5 kept its records and filed its income tax returns on an accrual basis for a fiscal year ending March 31. FM No. 5 filed its Federal income tax returns for its fiscal years ending March 31, 1970, 1971, 1972, 1973 and 1974 with the Internal Revenue Service Center, Fresno, California. Petitioner Farmers Market of Northern California, Inc. (FMNC), a California corporation incorporated in August 1953, had its principal place of business in Sacramento, California, at the time of filing its petition in this case. FMNC *282 kept its records and filed its income tax returns on an accrual basis for a fiscal year ending March 31. FMNC filed its Federal income tax returns for its fiscal years ending March 31, 1970, 1971, 1972, 1973 and 1974 with the Internal Revenue Service Center, Fresno, California. Petitioner Farmers Market of South Sacramento, Inc. (FMSS), a California corporation incorporated in February 1956, had its principal place of business in Sacramento, California, at the time of filing its petition in this case. FMSS kept its records and filed its income tax returns on an accrual basis for a fiscal year ending February 28. FMSS filed its Federal income tax returns for its fiscal years ending February 29, 1972, and February 28, 1973 and 1974 with the Internal Revenue Service Center, Fresno, California. Petitioners Walter Fong (Mr. Fong) and Yee Shee Fong (Yee Shee), husband and wife, resided in Sacramento, California, at the time of filing their petition. Mr. Fong and Yee Shee utilized the cash method of accounting and filed a joint Federal income tax return for each of the calendar years 1972 and 1973 with the Internal Revenue Service Center, Fresno, California. Mr. Fong is of Chinese *283 ancestry and emigrated to the United States in or about 1922. In 1928, Mr. Fong married Yee Shee in China and thereafter brought her to the United States. In 1950, Mr. Fong brought Mun Li Fong (Mun Li) to the United States. Mun Li was born in 1926 in China where she lived until her departure. Mun Li and Mr. Fong had 7 children: Samuel B. Fong, Wanda Fong Toy, Peggy Fong Wong, Jerry Fong, Art B. Fong, Franklin Fong and Anna Fong. Mr. Fong has been Mun Li's sole financial support since her arrival in the United States. Mr. Fong founded Farmers Markets, Inc. (FM) as the company under which to operate grocery stores in and around Sacramento, California. FM is headquartered in Sacramento and Mr. Fong opened the first grocery store in 1949. From 1971 through 1974, seven corporations in which Mr. Fong was a shareholder operated 36 supermarkets under the FM trade name; these 36 supermarkets are individually referred to by number. A number of corporations and partnerships which have been involved in operating or contributing to the operation of the FM grocery stores include FMNC, FM No. 5, FMSS (hereinafter these three corporations may be referred to as store-operating corporations). *284 [4] FCMC, Farmers General Market Corp. (FGMC), Farmers International Market Corporation (FIMC), LYE, FE, Farmers Management Services Co. (FMSC), Farmers Cattle Co. (FCC), and WNC. Each of these entities functioned as follows: Entity
Function
FMNC
Operated grocery stores Nos. 7 and 12.
FM No. 5
Operated grocery stores Nos. 5, 10 and 11.
FMSS
Operated grocery stores Nos. 3, 6 and 9.
FCMC [5]
Operated grocery stores Nos. 14, 15 and 16.
FGMC [5]
Operated grocery stores Nos. 17 through 21 before
1972, and in 1973 added stores Nos. 36 through 42.
FIMC[5]
Opened and operated stores Nos. 22 and 24 through
31.
LYE
Opened store No. 23 in 1972 and opened stores Nos.
32 through 35 in 1973.
FE[6]
Employed top executive level management, including
Mr. Fong, meat and grocery store buyers, accounting
and security personnel, operated a produce
warehouse, etc.; negotiated supply contracts and
leases; assisted stores in pursuit of credit.
FMSC [7]
Employed middle and operational management;
provided hauling services, accounting, etc.
FCC[8]
Involved in experimental program in raising and
feeding Holstein cattle for slaughter and for the
sale of meat through FM grocery stores; program
eventually evolved into a feed yard operation in
Idaho.
*285 *286 Mr. Fong and D. Herbert Gray [9] created FCC to catalyze expansion of the FM grocery chain. In large part, Mr. Gray designed, developed and managed the FCC meat program. Its purpose was to produce better quality beef at a cost to the FM grocery stores lower than the stores had previously been able to obtain beef from Armour and Co. (Armour). Mr. Gray and Mr. Fong believed that the FM grocery stores might earn greater profits by buying the FCC fattened Holsteins and that the increased profits could provide an infusion of capital for expansion of the grocery chain. *287 Between February 5 and March 26, 1973, FCC purchased a Holstein cattle lot for a total cost of $656,032.92. This first lot was known as "Operation One." Between November 1973 and September 1974, FCC purchased Holstein cattle at a cost of $1,330,268.31. This second lot was known as "Operation Two." In 1973, FCC entered into contracts with Ed Uhlig Feedlots, Inc. (Uhlig), and Jones Livestock Feeding Co. (Jones) to feed the FCC cattle. The contracts with Uhlig were dated February 13, 1973, and July 23, 1973; the contract with Jones was dated August 14, 1973. The terms of the three contracts were nearly identical. [10] Each provided that Uhlig and Jones agreed to feed and care for the FCC cattle. FCC promised to pay certain sums into a bank account entitled Chancellor Investitures Trust (Trust Account). The contracts recited that the Trust Account trustees, Mr. Gray and Carl Stein, would pay Uhlig and Jones for their costs upon their periodic submission of their bills. In pertinent part, the contract between FCC and Uhlig provided: WHEREAS, because of the tremendous expansion program instituted by the supermarket chain, there is a need for dressed beef by the Farmers Cattle *288 Company in order to continue to meet the supply and need of the supermarket chain, and * * * WHEREAS, Uhlig is concerned re Farmers Cattle Company's ability to comply with the terms of this contract to the extent of assuring payments for cattle that Armour will have to place in other lots for feeding which necessitates that prepayment is required by Uhlid as a condition of entering into any agreement to feed cattle. THEREFORE, Farmers Cattle Company and Uhlig Feedlots, Inc. thereby enter into the following agreement: 1. Between February 1, 1973, and March 30, 1973, Farmers Cattle Company will deliver to Feeder at its feedlot located at Hansen, Idaho (the "Feedlot"), between 1,000 and 2,000 cattle (the "Cattle"). As security for the payment of the consideration described in paragraph 3 hereof, Feeder will deposit with the First Security Bank of Idaho, the sum of $198,632.00 in a trust account in the name of Chancellor Investitures, account no. 03-00050-52. [11] That Chancellor Investitures, a partnership, located at 3500 American River Drive, Sacramento, California, as Trustee, is hereby authorized to draw from said account for payment to Uhlig such sums as Uhlig may bill *289 the Trustee on the 15th of each month. Said Trustee is hereby authorized to make such payments within ten (10) days after said billing. In the event during the term of this contract, said Trustee account should be depleted, Feeder will replenish said account in sums sufficient to make payment as herein required. In the event of termination of this Agreement or its expiration, should Trustee have on hand funds not payable to Uhlig, said funds shall remain the property of Farmers and will be returned by Trustee to Farmers. 2. Feeder shall provide, at its expense, all feed, accommodations, such as pens, feed bunks, water, shelter, etc., all veterinary medicine and services, and all labor, necessary for the proper care and maintenance of the Cattle, and shall feed and care for the Cattle in a good and husband like manner until the Cattle reach slaughter grades and weights as determined by Farmers Cattle Company. * * * 3. During the time the Cattle are in the Feedlot, Farmers Cattle Company will pay Feeder as full remuneration for feeding and caring for the Cattle an amount equal to the sum of the following: a. The cost of feed fed the Cattle. The cost of each such feed formulation *290 shall be separately determined and shall be deemed to be Feeder's weighted average cost per hundred weight of ingredients. Feeder's cost of an ingredient shall be deemed to be the actual purchase price per hundred weight (including freight to the Feedlot) paid by Feeder for the total quantity of such ingredient received by Feeder at the feedlot for all his feeding operations, computed on a first-in, first-out basis. Feeder, upon request, will furnish Farmers Cattle Company the current cost of each feed formulation then being fed to the Cattle. * * * b. A service charge of $10.00 per ton of feed fed. [12]
4. Feeder will render billings at the 15th of each month. Billings for feedlot services performed in one month will be due by the 25th of the following month and each lot will be billed and accounted for separately. * * * 6. Farmers Cattle Company shall reimburse Feeder for expense incurred for veterinary medicine and services administered to the Cattle. Labor relative to veterinary services will be furnished by Feeder at no charge to Farmers. 7. Title to the Cattle shall remain in Farmers Cattle Company at all times. * * * Pursuant to the terms of the February 13, 1973, contract *291 with Uhlig, on March 29, 1973, FCC deposited $198,632 into the Trust Account. *292 From February 16, 1973, through August 15, 1973, Uhlig's feed costs were as follows: Feed Lots
Charley
Frank
Ray
Bob
Mixed
Mixed
Mixed
Mixed
1973
Feed
Silage
Feed
Silage
Feed
Silage
Feed
Silage
2/16 to
3/15
$65.00
$12.00
$65.00
$12.00
$65.00
$12.00
3/15 to
4/15
65.00
12.00
65.00
12.00
65.00
12.00
66.80
14.00
4/16 to
5/15
65.00
12.00
65.00
12.00
65.00
12.00
66.80
14.00
5/16 to
6/15
65.00
14.00
65.00
14.00
65.00
14.00
70.00
14.00
6/16 to
7/15
65.00
16.00
65.00
16.00
65.00
16.00
73.46
16.00
7/16 to
8/15
65.00
16.00
65.00
16.00
65.00
16.00
83.60
16.00
Prior to the end of FCC's fiscal year ending March 31, 1973, feed was consumed by FCC's cattle in the following amounts: Feed Bill Period
Lot
Amount
2/16/73 to 3/16/73
Charley
$ 6,298.14
2/16/73 to 3/16/73
Frank
19,260.84
2/16/73 to 3/16/73
Ray
9,582.46
3/16/73 to 4/15/73
Bob
1,955.19
3/16/73 to 4/15/73
Charley
3,639.28
3/16/73 to 4/15/73
Frank
10,312.38
3/16/73 to 4/15/73
Ray
6,871.19
Feed expense for feed consumed as of 3/31/73
$57,919.48
In addition *293 to the required contract payments, FCC made several direct payments to Uhlig and Jones. On November 15, 1973, FCC directly paid Jones $85,000 for its purchase of 2 million pounds of corn at a price of $4.25 per hundred weight. On March 28, 1974, FCC paid $75,000 directly to each Uhlig and Jones. Uhlig treated the $75,000 as a "feed advance" and applied it to the charges listed on its april 16, 1973, bill to FCC. The $75,000 payment exceeded the April charges, and therefore Uhlig treated the excess as an "advance balance." It applied the excess amount to the charges on the May 16, 1974, bill. Jones treated the $75,000 similarly. The amount in excess of the charges shown on its April bill was applied against the charges on its May 17, 1974, bill which covered April 16, 1974, through May 16, 1974. During 1974 only a portion of the corn and barley purchased for the FCC cattle was actualy fed to them. In addition to the 2 million pounds of corn which Jones had purchased, it bought 4 million pounds of barley. [13] Jones fed 1,898,520 pounds of the barley and 1,084,194 pounds of the corn to the FCC cattle. [14] The records of Jones and Uhlig show that each applied the $75,000 received *294 from FCC to the bills for feed and to feed consumed before March 31, 1974, as follows: Uhlig Feedyard: 3/16/74 to 4/15/74
$43,355.21
4/16/74 to 5/15/74
31,644.75
Total
$75,000.00
Feed used before 3/13/74: 1/2 of $43,355.21
$21,677.61
Jones Feedyard: 3/16/74 to 4/15/74
$49,220.00
4/16/74 to 5/15/74
25,780.00
Total
$75,000.00
Feed used before 3/13/74: 1/2 of $49,220.00
$24,610.00
Feed used before 3/13/74: Uhlig Feedyard
$21,677.61
Jones Feedyard
24,610.00
Total
$46,287.61
The numerous FM grocery stores utilized the same suppliers of groceries and other goods, including Armour, Market Wholesale Co. (MW), and Crystal Cream and Butter Co. It was the practice of each store separately to order its required merchandise. As protection against either slow payment, nonpayment *295 of bills or receipt of a valueless check for supplies ordered, some suppliers required an initial purchase deposit prior to delivery of the goods. [15] Other suppliers, including Armour and MW, required or requested Mr. Fong personally to guarantee, orally or in writing, that payment would be forthcoming from the FM corporations. [16] Until approximately 1963, Mr. Fong had extended his personal guarantee to suppliers only with respect to six groceries. As the FM corporations expanded, added stores and increased their exposure, food distributors increasingly requested Mr. Fong to personally guarantee purchases of supplies. For example, MW *296 and Mr. Fong executed a written agreement whereby Mr. Fong made a continuing guarantee to cover the purchase of goods, wares and merchandise. Pursuant to the continuing guarantee, Mr. Fong agreed to pay MW upon demand for the full amount of indebtedness of each grocery store covered by the guarantee. The continuing guarantee further provided that-- It is absolutely agreed that the continuing guarantee is absolute and complete and I [Fong] waive all presentment, demands for performance, notices of nonperformance, protests, notices of protests, notices of dishonor, and notices of acceptance of the guarantee and of the existence, creation or incurring of new or additional indebtedness. The continuing guarantee provided that its term would remain in full force and effect until surrendered or until Mr. Fong presented a written revocation to MW. In 1971, Mr. Fong expressed concern to Mr. Gray that he was risking his personal financial welfare by extending his personal guarantee on behalf of the various FM store-operating corporations. Mr. Fong stated to Mr. Gray that he felt that he should be compensated for his exposure. After Mr. Fong discussed his concerns with his personal *297 attorney, Mr. Stein, and with his C.P.A., Mr. Fong presented to the boards of directors of FMSS, FMNC, and FM No. 5 requests for compensation for past, present and future personal guarantees. In response, the boards of directors requested that Mr. Gray compute a fee considered reasonable as payment to Mr. Fong for his guaranteeing the debts of the FM store-operating corporations. In accordance with these requests, Mr. Gray computed the fees. He utilized three factors in making his computations: (1) an approximation of the amount of liabilities that the FM corporations would have outstanding if forced into bankruptcy; (2) based on the 1960 through 1969 period, the average percentage of trade credit that Mr. Fong might be required to pay if the FM corporations went bankrupt; and (3) a reasonable interest rate. On March 7, 1972, the boards of directors of FMNC, FMSS and FM No. 5 passed resolutions to compensate Mr. Fong for his personal guarantees of the trade accounts payable. Although the actual amount of compensation differed as to each corporation, each amount was based on Mr. Gray's calculations. The corporate resolutions were worded similarly to state: Resolve that the *298 corporation pay to Walter Fong the sum of * * * as compensation for Mr. Fong's guarantee of corporate obligations as described in the minutes of the Board of Directors dated September 28, 1971, and October 6, 1971. Said sum is to be paid to Walter Fong at the time to be determined by consultations between Walter Fong and this Board of Directors acting in consultation with its accountant regarding its financial convenience in making said payments. The time of payment does not diminish this Corporation's ultimate obligation to make the said payment. The October 6, 1971, boards of directors' minutes to which the resolutions referred also used similar language. As recited-- Mr. Fong indicated that he, at the advice of counsel and his personal C.P.A., would no longer guarantee any of the liabilities for the corporations since he was a minority shareholder * * *. Mr. D. Herbert Gray reported to the Board of Directors that an investigation had been conducted and there were general guidelines for the payment of sums of money to a guarantor for the use of his personal guarantee. Mr. Gray had consulted financial institutions and academicians to determine the amounts and rate charged *299 in similar situations. Mr. Gray further informed the Board of Directors that without the personal guarantee of Mr. Fong it is his expert opinion that the corporation would be bankrupt in a short period of time, and the credit previously extended to the corporations would be terminated. Whereupon the following resolution was adopted: WHEREAS, it is in the corporation's best interest to maintain the personal guarantee of Mr. Fong, and WHEREAS, the corporation acknowledges that Mr. Fong has not been compensated for guarantees in the past, present, or for the future, and WHEREAS, the corporation, after reviewing the working papers of D. Herbert Gray, C.P.A., has deemed it in the best interest of the corporation to pay Mr. Fong for the use of his personal guarantee pursuant to said working papers, NOW, THEREFORE, BE IT RESOLVED, that the corporation enter into an agreement with Mr. Fong pursuant to the working papers presented to the board by Mr. Gray whereby Mr. Fong is compensated for the personal guarantees in the past, present and future. In their respective fiscal years ending in 1972, the store-operating corporations accrued a deduction for credit guarantee fees payable *300 to Mr. Fong in the following amounts: FMNC--$499,835.80, FMSS--$394,475.47, and FM No. 5--$343,470.15. These accruals were entered in the corporate books and were claimed by the corporations as deductions for Federal income taxes in their respective fiscal years ending in 1972. The corporations did not give Mr. Fong promissory notes for the accrued amounts. For its fiscal year ending in 1972, FMNC had total current assets of $1,376,017, trade accounts payable of $570,714, total current liabilities of $638,849, total debt of $1,611,249, shareholder equity of $74,965, and inventory of $369,805. For its fiscal year ending in 1972, FMSS had inventory of $346,176, total current assets of $547,637, trade accounts payable of $328,303, total current liabilities of $386,187, total debt of $982,207, and shareholder equity of ($121,255). For its fiscal year ending in 1972, FM No. 5 had inventory of $440,238, total current assets of $1,394,196, trade accounts payable of $559,624, total current liabilities of $642,230, total debt of $1,545,482, and shareholder equity of $286,399. FMNC, FMSS, and FM No. 5 never requested Mr. Fong to pay any amount of their outstanding trade accounts payable, *301 the suppliers did not seek payment from Mr. Fong for supplies delivered to the various grocery stores, and Mr. Fong paid no amounts to any supplier because of his guarantees. Subsequent to Mr. Fong's requests for compensation, none of the store-operating corporations sought to have one or more of their suppliers relax or terminate the request or requirement that Mr. Fong personally guarantee the corporate trade accounts payable. They did not attempt to replace Mr. Fong with another guarantor nor did they seek a deposit arrangement with suppliers in lieu of Mr. Fong's personal guarantees. FMNC, FMSS and FM No. 5 did not seek a bank loan or a line of credit in lieu of Mr. Fong's guarantees nor did they pursue any other alternative to Mr. Fong's acting as sole guarantor. In February 1977, Mr. Fong was paid the following amounts in discharge of the accrued guaranteed fees: FMNC    -- $499,855.80 principal plus $224,926.10 interest FMSS    -- $394,475.47 principal plus $177,513.95 interest FM No. 5 -- $343,470.15 principal plus $154,561.55 interest Mr. Fong and Yee Shee reported these amounts as income on their 1977 Federal income tax return. In the 1960's, *302 Mr. Gray was the accountant for FMSS and FM No. 5, Jack Louie was the accountant for FMNC and a director and officer of some of the FM corporations. Ruby Leong was the bookkeeper for FM No. 5 and office manager and a director and officer of FM; she also was a stockholder in FMSS and FM No. 5. [17]
The accounting systems and books of the FM corporations and partnerships were created to retain the separateness of the entities. Numerous bank accounts were maintained; however, there was one common bank account, the "FM General Account." [18] The various FM entities deposited funds into the FM General Account and drew checks on it to pay the suppliers of goods, various service organizations, etc. As a general rule, the bookkeeper collected suppliers' bills from the various grocery stores. At the end of each billing cycle, on behalf of each of the store-operating corporations, a cumulative check was written to each supplier. After payments were made in this fashion, accounts were reconciled so as to separately maintain the various entities' assets and liabilities. *303 For its fiscal years ending in 1973 and 1974, FMNC had current assets of $1,690,585 and $1,872,292, respectively. In those same years current liabilities were $1,565,937 and $1,072,206, respectively. For its fiscal years ending in 1973 and 1974, the net income(loss) of FMNC were ($138,253) and $190,591, respectively. For its fiscal years ending in 1973 and 1974, FMSS had total current assets worth $711,077 and $927,119, respectively; total current liabilities were $1,051,207 and $687,144, respectively; the net income(loss) of FMSS were ($12,925) and $22,052, respectively. For its fiscal years ending in 1973 and 1974, FM No. 5 had total current assets of $1,324,469 and $1,559,370, respectively; for these years its total current liabilities were $1,409,142 and $873,273, respectively; the net income(loss) of FM No. 5 in those years were ($159,747) and $214,669, respectively. The main purpose of Elk Grove Hop Ranch Partnership (Elk Grove) was the ownership of certain real property located in *304 Sacramento, California. Elk Grove also raised hops and some row crops. At harvest time Elk Grove hired 50 to 60 workers. Two bank accounts were maintained for Elk Grove--(1) a payroll account signed by the foreman, and (2) an expense account signed by Hing Owyang or Mr. Fong. Elk Grove operated pursuant to a written partnership agreement dated July 2, 1962. As recited in paragraph one of the partnership agreement, each partner had-- an undivided interest in and to the said lands * * *, each holding the percentage of ownership therein and thereto, as undivided owners in common with other tenants, as set forth after their respective names. Where the names of the spouses of said persons are indicated, said interest in common is held by said person as community property with their respective spouse. Percentage
Name
of Ownership
Hing Owyand, Jr. and
Helen F. Owyang
9.0909
Walter Fong and Yee Shee Fong
9.0909
Hing We Fong and Irene Fong
9.0909
Chuck Fong
4.5455
Lee Yuen
4.5455
Yon Yee and Bow Chen
13.6363
Howard S. Fong and Hom Shee
4.5455
Sheu Kwok Fong and Yee Gin Ling
4.5455
Leong Gum Dork and Ruby Leong
4.5455
Kay Fong and Yee Chin Kam
4.5455
James K. Y. Fong and Esther Fong
4.5455
Kong Quong Gee and Jin Gee Kong
4.5455
Jimmie Bong Yee and Gin Shee Yee
4.5455
Percy Lee and Mae Lee
4.5455
James Y. Lau and Linda M. Lau
4.5455
Bing Koon Leong and Yu Yuet
4.5455
Gouie Fat Leong and Yee Shee
4.5455
*305 Paragraph two of the Elk Grove partnership agreement appointed Hing Owyang, Jr., Mr. Fong, Hing We fong, Kong Quong Gee and James K. Y. Fong as managing trustees of the partnership and of its property. The partnership agreement gave to the managing trustees broad authorities and powers, including authority to manage the property, to enter into leases and agreements concerning the leasing of the property, to plant crops, to pay bills and obligations arising from ownership and management of the property, and to borrow money upon the property. Paragraph five of the partnership agreement set forth the rule regarding transferability of a partner's partnership interest. Specifically, it provided that-- In the event that any party hereto shall wish to sell, transfer or assign his partnership interest herein, or any part thereof, he shall first offer same for sale to other members of the copartnership, designating the price offered and in the event that the remaining partners do not wish to purchase same within thirty days after same is offered to them, said partner may then sell, transfer or assign his interest to other persons and said successor in interest shall become bound *306 by all of the terms, conditions and covernants of this agreement and shall execute this agreement as a party thereto. In a January 3, 1972, document drafted by Mr. Stein entitled Declaration of Gift, Mr. Fong declared that he was part owner of the property held by Elk Grove and that he wished to irrevocably give this property to Mun Li. In the final paragraph, Yee Shee consented to giving this gift. By grant deed, dated January 3, 1972, Mr. Fong and Yee Shee granted to Mun Li their interests in properties held by the Elk Grove partnership.Mr. Fong and Yee Shee signed the Declaration of Gift and the grant deed in the presence of Mr. Stein. The grant deed was recorded in the official records of the Sacramento County Recorder on October 29, 1974. Shortly after Mr. Stein prepared the grant deed and Declaration of Gift, Mr. Fong directed him to take copies of the documents to Mr. Gray, Mun Li's personal accountant, in 1972. Mr. Stein made copies of both documents and delivered the copies to Mr. Gray before placing the originals in his files. In 1972, Mr. Stein did not discuss with Mun Li the existence of the Declaration of Gift or the grant dee. In 1974, Mr. Stein discovered the *307 original documents in his files; soon thereafter he sent Mun Li copies of both documents. On January 3, 1972, Mr. Stein prepared a document for the signature of the various partners of Elk Grove. The document stated that the signatories waived the requirement of paragraph five of the partnership agreement. The purpose of this document was to allow Mr. Fong and Yee Shee to transfer their Elk Grove partnership interest to Mun Li without first offering it to other partners. Mr. Stein did not transmit this document to any of the Elk Grove partners until June 5, 1973. Mr. Gray prepared a Form 703, United States Quarterly Gift Tax Return, for calendar quarter ending March 1972 for Mr. Fong and Yee Shee. The gift tax return showed that Mr. Fong and Yee Shee had given a 9 percent interest in Elk Grove to Mun Li. The return listed the date of the gift as January 3, 1972, and its value as $28,530.65. Next to Mr. Fong's signature was the date October 15, 1973; no date appeared next to Yee Shee's signature. Next to Mr. Gray's signature appeared the date February 14, 1974. These returns were filed with the Fresno Service Center of the Internal Revenue Service on February 21, 1974. *308 At yearend 1972, Mr. Gray notified the Elk Grove accountant of the transfer in order that the proper parties would receive their allocable share of the 1972 Elk Grove partnership income and loss. Elk Grove filed annual Federal returns of partnership income. On the return for 1972, the following persons were listed as partners in Elk Grove: Yon Yee
Howard S. Fong (also known
Mun Li Fong
as Fong Suey Young)
Hing Owyang
Sheu Kwok Fong
Chuck Fong
Kay Fong
Jimmie Bong Yee
James Y. Lau
Percy Lee
Bing Koon Leong
Kong Quong Gee
Estate of Gouie Fat Leong
Soon Kim Yee (aso known as Kim
Yuen Chin)
On Mun Li's 1972 income tax return prepared by Mr. Gray, she reported $797 income from the Elk Grove Hop Ranch partnership and claimed an investment tax credit of $209 with respect to property of that partnership. Throughout 1972 Mr. Fong jointly signed all Elk Grove non-payroll checks with Mr. Owyang. Mr. Fong continued to be named as an insured party on Elk Grove insurance policies through May 1974. It was not until the October 1974 recordation of the grant deed that the public legal records deleted Mr. Fong as part owner of the Elk Grove real estate. *309 As part of the plan to expand the FM chain and to develop a franchise system, FMSC was formed on September 1, 1972, to provide middle-management services to FM's store-operating corporations, including FMSS, FMNC and FM No. 5. At the suggestion of Mr. Gray, FMSC adopted the cash method of accounting and chose the calendar year as its taxable year. On September 1, 1972, FMSC entered into identical written agreements with FMNC, FMSS, FM No. 5, SCM, FGM, FIC and LYE. Mr. Fong signed each of these agreements on behalf of each of the corporations. FMSC agreed to employ, provide the services of and pay the store managers in addition to paying certain other expenses; in exchange, FMSC was to receive reimbursement for those payments plus a 10 percent profit. The amount of profits were to be determined from the books and records of the FM corporations; the expenses for which FMSC was to be reimbursed would include salaries of FMSC personnel, delivery service, drivers, loaders and unloaders of delivered products, etc. The billing specifications provided that FMSC would bill quarterly-- with the exception of the first four (4) months which shall be billed initially, then starting on *310 January 1, 1973 quarterly. That FARMERS MANAGEMENT SERVICE COMPANY will send to corporation the quarterly billing within (60) days of the close of the billing period and that corporation shall have 30 days to pay. [19]
The following schedule shows the date of billing by FMSC for management services, the quarter to which the billing related, the date shown on the books as the date it received payment for the quarters indicated and the total for the calendar year 1973: 4th Quarter
1st Quarter
2nd Quarter
3rd Quarter
1972
1973
1973
1973
Date of Billing
4-30-73
7-31-73
8-1-73
10-31-73
Due from Farmers
Markets, Inc.
per billings: Hauling Service
$17,775.00
$15,354.75
$19,864.46
$28,290.20
Management Service
773,662.26
660,436.98
697,222.78
674,173.42
Compensation and
General
Insurance
Dates of Actual
Receipt of
Payment per Books
6-8-73, 7-20-73
10-26-73
12-21-73
2-1-74
*311 Annual
4th Quarter
Billing
Total
1973
1973
1973
Date of Billing
2-28-74
2-28-74
Due from Farmers Markets, Inc.
per billings: Hauling Service
$22,943.75
$86,453.15
Management Service
744,151.93
2,775,985.11
Compensation and General
Insurance
$205,753.58
205,753.58
Dates of Actual Receipt of
Payment per Books
4-3-74, 5-3-74
In 1972, FMSC paid expenses of $752,666. On its 1972 partnership return of income, FMSC did not report any partnership income for the year. The $752,666 of expenses paid in that year was reported as a net loss on the return. For services actually rendered in 1972, FMSC billed a total of $822,998.95 in 1973. In 1973, FMSC paid $3,041.007 in expenses. On June 8, 1973, FMSC received reimbursement for those expenses incurred between September and December of 1972 plus its 10 percent profit. Between June and yearend 1973, FMSC received payment for its billings for the first two quarters of 1973. The third quarter 1973 bills were sent to the FM corporations on October 31, 1973; however, payment was not recorded as received by FMSC until February 1, 1974. All expenses paid for the four quarters *312 of 1973 were reported as such by FMSC in that taxable year on its partnership return of income. FMSC reported on its 1973 partnership return of income $2,348,656 in income and a net loss of $692,351. On its Federal income tax return for its fiscal year ending in 1973, each FMNC, FMSS and FM No. 5 deducted its allocable share of the 1972 net loss reported by FMSC on its partnership return of income. Each FMNC, FMSS and FM No. 5 in its fiscal year ending in 1974 deducted its allocable share of the net loss reported by FMSC on its 1973 partnership return of income, and Mr. Fong and Yee Shee reported their allocable part of this loss on their return for the calendar year 1973. As of December 31, 1972, FMSC had cash on hand of $19,376.This cash was on deposit in the FM General Account. As part of the plan for expansion of the FM grocery operations, in 1972, 1973 and 1974 FGMC, LYE and FIMC opened seven new grocery stores and acquired fourteen existing stores from Bazar, Inc. (Bazar). Pursuant to contracts that FE had with each FGMC, LYE and FIMC, FE agreed to provide management services-- to assist in the opening of new stores and supermarkets--such services include but are not *313 limited to advising or regarding the replacement of inventory, the proper inventory, best utilization of space, etc.; to provide consultations regarding systems and controls, pricing policies, purchasing policies, etc.; to assist in the physical installation of inventory; to create and implement an advertising program for opening stores; for hiring employees and supervision of labor necessary to open new stores and to supply technical assistance, interface and coordination during the preopening period. FE also agreed to provide "long term management, purchasing, planning and construction of new facilities, negotiations for purchase of facilities and equipment as a portion of the management services." The contracts further stated that "if and when a new store is opened by the corporations the services provided, aside from the normal management services and produce warehousing services, a fee of fifteen thousand dollars ($15,000) will be paid for special opening services" to FE. In 1972 FIMC opened one new store and acquired eight stores from Bazar. Pursuant to the contract between FIMC and FE, FIMC accrued and paid a total of $135,000 to FE under the $15,000-per-store special *314 opening services fee provision. FIMC deducted these fees as current business expenses in 1972. In 1973 FGMC opened four new grocery stores and acquired two operating grocery stores from Bazar. Pursuant to the contract between FGMC and FE, FGMC accrued and paid FE a fee of $15,000 for each of those six stores for "special opening services." FGMC deducted a total of $90,000 for the special opening services fees as current business expenses in 1973. In a May 25, 1972, contract between FIMC, as purchaser, and Bazar and Cal Bazar, Inc. (Cal), as sellers, FIMC promised to purchase the sellers' rights as sublessee of eight operating grocery stores. FIMC further agreed to purchase the merchandise, inventories and supplies owned by the sellers and located at the eight grocery stores; FIMC additionally agreed to purchase certain fixtures and equipment. Section 2 of the contract specified the purchase price, which, in relevant part, was recited as follows: SECTION 2 PURCHASE PRICE
(a) Merchandise Inventories and Supplies: The purchase price for the merchandise inventories and supplies located at the stores shall be an amount equal to the total of-- I (i) Sellers' cost *315 of supplies; (ii) Sellers' retail sales price for packaged meat less 22 percent and Sellers' retail sales price for packaged delicatessen items less 25 percent; (iii) Sellers' cost for unpackaged (i.e. carcass) meats; (iv) Sellers' retail sales price for produce less 30 percent; (v) Sellers' retail sales price for all nongrocery items less 25 percent ("nongrocery" items shall be those items on a list heretofore reviewed and initialed by representatives of Sellers and Purchasers); (vi) Sellers' retail sales price for all other merchandise inventory items less 17-1/2 percent; and (vii) The sum of $320,000, representing an agreed value of $40,000 per store with respect to the merchandise inventory at each store for purchasing, storage, handling, unloading, stocking of shelves and pricing and other labor costs. On its 1972 Federal income tax return, FIMC deducted the $320,000 portion of the purchase price represented in Section 2(a)(vii) as a cost of goods sold; FIMC accrued this amount in its corporate books as a cost of goods sold for 1972. Section 4 of the May 25, 1972, contract further discussed the computation of the purchase price for the merchandise, inventories *316 and supplies.In pertinent part, it provided as follows: The purchase price for the merchandise inventories and supplies shall be computed in accordance with the formula set forth in Section 2(a) based upon the determination of such inventory service as to quantities of included items and retail prices, where applicable, and upon cost figures supplied by Sellers, where applicable. All supplies, and all inventory items in excess of $2,000 per store (priced pursuant to Section 2(a)), which are labeled with the trademarks K-mart or Bazar shall be removed by Sellers from the supplies and inventories to be purchased by Purchasers. Section 12 of the May 25, 1972, contract specified the terms under which the sellers agreed to close each store. It provided as follows: Sellers agree to close each store and to terminate the employment of all Sellers' employees at the store as of the close of business on the Saturday immediately preceding the inventory date for the store. Sellers shall give all their employees at least four days' advance notice of termination. Sellers shall be responsible for all obligations under Union agreements with respect to each store to and including the date *317 of closure thereof by Sellers. Section 15 of the May 25, 1972, contract specified the appropriate conduct of business for the sellers. Specifically, it provided: Sellers agree until the closure date for each store to continue to conduct business in substantially the same manner as such business has heretofore been carried on, provided that Sellers may engage in inventory reductions and promotional activities (except going out of business sales) which they deem davisable. On November 12, 1973, FGMC, as purchaser, entered into an agreement with Bazar and Cal, as sellers, for the purchase of the sellers' rights as sublessee of two supermarkets. The parties agreed that FGMC would purchase the merchandise, inventories, and supplies of the stores and certain equipment. The purchase price as set forth in Section 2, in relevant part, stated: (a) Merchandise Inventories and Supplies The purchase price for the merchandise inventories and supplies located at the stores shall be an amount equal to the total of: (i) Sellers' cost of supplies; (ii) Sellers' retail sales price for packaged meat less 22 percent and Sellers' retail sales price for packaged delicatessen items less *318 25 percent; (iii) Sellers' cost for unpackaged (i.e. carcass) meats; (iv) Sellers' retail sales price for produce less 30 percent; (v) Sellers' retail sales price for all nongrocery items less 25 percent ("nongrocery" items shall be those items on a list heretofore reviewed and initialed by representatives of Sellers and Purchaser); (vi) Sellers' retail sales price for all other merchandise inventory items less 17-1/2 percent; and (vii) The sum of $80,000, representing an agreed value of $40,000 per store with respect to the merchandise inventory at each store for purchasing, storage, handling, unloading, stocking of shelves and pricing and other labor costs. (b) Equipment and Tenant's Interests: The purchase price for the fixtures, equipment and tenant's interest referred to in Sections 1(b) and 1(c) shall be $150,000 for the part thereof located at the store at 3600 Wilson Road plus $120,000 for the part thereof located at the store at 403 - 34th Street. As with the May 25, 1972, contract between FIMC and Bazar and Cal, this November 12, 1973, contract between FGMC and Bazar and Cal provided the same language as above quoted from Sections 4, 12, and 15. FGMC *319 accrued the $80,000 referred to in the November 12, 1973, contract Section 2(a)(vii) and categorized it as a cost of goods sold on its corporate accounting books. On its Federal income tax return for 1973, FGMC treated the $80,000 as cost of goods sold and currently deducted it from its income. Mr. Gray was involved in negotiating the May 25, 1972, and November 12, 1973, agreements. In his negotiations, he considered the amount of $40,000 per store to represent payment to Bazar and Cal for "current labor costs" to have their employees remove private labels from goods, reprice goods, stock shelves, etc., prior to the FIMC and FGMC takeover. FIMC and FGMC required that this work be performed overnight in order that the grocery stores would not need to be closed temporarily pending takeover. [20]
In 1973, FCMC deducted $75,000 as accrued expense on its Federal income tax return, claiming the $75,000 as a fee payable to FMSC. On February 14, 1974, FCMC executed a promissory note payable to FMSC in the amount of $75,000. As of October 26, 1982, FCMC had not made payments on the $75,000 promissory note. *320 The $75,000 fee was not mentioned in the corporate minute books of FCMC and was not payable pursuant to an oral or written agreement. In 1973, FCMC deducted as an accrued expense $93,000 on its Federal income tax return, claiming the $93,000 was a fee payable to FCC. FCMC paid the $93,000 fee to FCC in 1976 in connecton with legal and accounting fees regarding the development of the expanding FM meat and franchising programs. As of December 27, 1972, Mr. Fong owed interest to FMSC in the amount of $70,228. On that date, at Mr. Fong's direction and on his behalf, Ruby Leong, bookkeeper for FM, signed two checks in her office at 401 S. Street, Sacramento, California. The checks, which totaled $70,228, were delivered to FMSC, which also had offices at 401 S. Street, Sacramento, California. FMSC deposited the $70,228 into its bank account on January 2, 1973. On his 1972 income tax return, Mr. Fong deducted $70,228 as interest paid to FMSC. FMSC reported the $70,228 as interest income in 1973. As of December 28, 1973, Mr. Fong owed interest to FMSC in the amount of $36,736. On that same date Mr. Fong drew two checks to represent payment of that interest--one for $8,653.90 and *321 the other for $28,082.17. On his income tax return for 1973, Mr. Fong deducted the $36,736 as an interest payment. FMSC deposited the $36,736 into its bank account on January 2, 1974. FMSC reported the amount as interest income on its 1974 income tax return. On February 9, 1972, as a salary payment from FCMC, Mr. Fong received a promissory note in the face amount of $20,000. The promissory note was payable on demand; it bore an annual interest rate of 8 percent. Mr. Fong was president and a 70 percent shareholder of FCMC throughout 1972. As of January 1, 1972, FCMC had cash on hand of $29,553; its cash on hand increased to $176,868 as of December 31, 1972. The FCMC shareholder equity account was $78,308 on January 1, 1972, and $111,709 as of December 31, 1972. With respect to the various petitioners, respondent explained his adjustments to their reported income and deductions, in pertinent part, as follows: Jerry Fong
Mun Li Fong
Stanley L. Wong and Peggy Fong Wong
Art B. Fong
Franklin Fong
Wanda Fong Toy
Samuel B. Fong
Peggy Fong Wong
Sammy G. Toy and Wanda Fong Toy
(a) Due to adjustments to the income of Farmers General Market Corporation, *322 a small business corporation of which you are a shareholder, the amount of taxable income of that corporation which is distributable to you is increased, in accordance with the computation below, and your taxable income is increased correspondingly. Exhibit A * * * shows the determination of the increase in income of the corporation. * * * ADJUSTMENTS TO TAXABLE INCOME FARMERS GENERAL MARKET CORPORATION
(Small Business Corporation) Year Ended December 31
1972
1973
Taxable income as reported per return
$147,519
188,635
Adjustments to income: (a) Inventory fee--Goodwill
80,000
(b) New store opening fee
90,000
(c) Alcoholic Beverage Control Dept.
2,201
(d) Depreciation
6,707
8,402
(e) Accrued lease payment--Crystal
Cream and Butter
(3,842)
Taxable income as corrected
$156,427
$363,295 [sic]
(a) For the year ended December 31, 1973, you claimed a deduction of $80,000.00 for inventory fees in connection with the purchase of two grocery stores from Bazar, Inc. This $80,000.00, consisting of $40,000.00 per store, is in addition to a provision in the purchase contracts for specific costs for merchandise *323 based on retail cost less standard discounts. It is held that the $80,000.00 represents cost attributable to goodwill, or the "going concern" value, and as such it is the cost of a nondepreciable intangible asset. Accordingly, the deduction claimed is disallowed and income is increased by $80,000.00. (b) During the year ended December 31, 1973, you acquired a total of six stores, two of which were purchased from Bazar, Inc., and four of which were new stores. You claimed a deduction of $15,000.00 for each store, for a total of $90,000.00, for a fee paid to Farmers Enterprises, Inc.It is held that the services rendered by Farmers Enterprises, Inc., for which you paid the fees, result in the creation of a non-amortizable intangible asset, and are therefore capital expenditures and are not currently deductible expenses. Income is therefore increased by $90,000.00 to reflect the disallowance of the new-store opening fees of that amount. Farmers Central Market Corporation (FCMC)
* * * (a) For the taxable year ended December 31, 1973, you accrued and deducted a special fee of $93,000.00 payable to Farmers Cattle Company, a cash-basis partnership of which the partners are *324 three corporations in which your controlling shareholder, Walter Fong, has an interest. No billing was rendered to you by the partnership for this fee, and the fee had not been paid as of May of 1975. It is held that the fee is not a deductible expense since you have not established the ordinary, necessary business nature of the item, or the reasonableness of the amount, nor have you substantiated any bona fide indebtedness to the partnership for the amount. (c) For the taxable year ended December 31, 1973, you also accrued and deducted a special fee of $75,000.00 payable to Farmers Management Services Company, a partnership on the cash basis method of accounting in which the partners are the same three corporations who are partners in Farmers Cattle Company. A billing was not rendered to you for the $75,000.00 fee by the partnership. A promissory note dated February 15, 1974, for this fee was signed by you, but such amount was not paid by May of 1975. The fee is disallowed as an expense since you have not established the ordinary and necessary business nature of the fee, or the reasonableness of the amount, nor have you substantiated the bona fide nature of the note as an arms-length *325 transaction. Farmers Market No. 5, Inc. (FM No. 5)
* * * (b) You claimed a deduction of $343,470.00 for the year ended March 31, 1972, for an amount designated as a credit guarantee fee; this represents an amount accrued but not paid, payable to Walter Fong for his personal guarantee of accounts payable to your suppliers. Mr. Fong is your president and is a shareholder in your corporation. It is held that this amount is not a deductible expense, since it has not been established that there is a definite and fixed liability to pay all or any portion of this amount to Mr. Fong. It is also held that this amount is not a deductible expense because you have failed to establish the reasonableness of the amount or the ordinary and necessary nature of the deduction. Furthermore, it is held that this amount is not deductible under the provisions of section 267 of the Internal Revenue Code, since it is held that Mr. Fong owns directly, indirectly, or constructively, over 50 percent of your stock, and this amount was not paid within two and one-half months of the close of the taxable year in which it was claimed as a deduction. (c) Due to adjustments to income *326 of the partnership, Farmers Management Service Company, as outlined in detail in Exhibit A, your taxable income is increased by $278,306.00 for the year ended March 31, 1973, and by $207,387.00 for the year ended March 31, 1974, to reflect your distributive share of the partnership adjustments. Computation of the increase in your income is shown below: Taxable Year Ended March 31
1973
1974
Ordinary net income of partnership as
determined, per Exhibit A: Year Ended December 31, 1971
$140,561 Year Ended December 31, 1973
$250,320 Your distributive share of corrected
income
44,980 55,070 Partnership loss claimed per return
(233,326)
(152,317)
Increase in taxable income
$278,306 $207,387 (d) Taxable income for each of the taxable years ended March 31, 1973, and March 31, 1974, is increased to reflect your distributive share of adjustments to the partnership income of Farmers Cattle Company; the increase in income is computed below: Taxable Year Ended March 31
1973
1974
Ordinary net loss of partnership as
determined, per Exhibit B
$ (39,094)
$ (475,318)
Your distributive share of corrected loss
(13,683)
(166,361)
Partnership loss claimed per return
(83,204)
(371,658)
Increase in taxable income
$ 68,521 $ 205,297 *327 * * * ADJUSTMENTS TO PARTNERSHIP ORDINARY NET INCOME OR (LOSS) FARMERS MANAGEMENT SERVICE COMPANY
* * * (a) It is held that the proper method of accounting to be utilized by you is the accrual method of accounting, rather than the cash basis method, in order to clearly reflect income. This determination is based upon the fact that the corporate partners are on the accrual method of accounting, and the utilization of the acsh basis method by you results in a distortion of income. Accordingly, income is increased by $822,999.00 for 1972 to reflect billings to the corporations who are not only your partners but are also your customers. Income for the year 1973 is increased by $976,163.00. These amounts are computed as shown in detail in the accompanying Exhibit A-1. In the alternative, it is held that the amounts held to be reportable as income in 1972 and 1973, as shown above, are reportable in 1972 and 1973 on the basis of constructive receipt of such income, inasmuch as the related corporations who are your partners had sufficient cash available to pay the fees, and your common controlling officer/shareholder could have written checks or caused adjusting journal entries *328 to be made, and set-offs could have been made between the accounts receivable and the accounts payable. (b) If is determined that you realized interest income of $70,228.00 in 1972 and of $36,736.00 in 1973, whereas you reported no interest income in 1972 and included the $70,228.00 as interest income for 1973 on the return for that year. The amounts determined for each year consist of checks written payable to you by Walter Fong in payment of interest due on loans, as shown below. It is held that the income is reportable in the year in which the checks were written inasmuch as Mr. Fong is the president of each of your corporate partners. Year Ended December 31
1972
1973
Check No. 1325, dated 12/27/72
$20,105.85
Check No. 1326, dated 12/27/72
50,122.38
Check No. 1916, dated 12/28/73
$ 28,082.17 Check No. 1915, dated 12/28/73
8,653.90 Interest income as determined (rounded)
$70,228.00
$ 36,736.00 Interest income reported
0.00
70,228.00 Adjustment to income
$70,228.00
$ (33,492.00)
ADJUSTMENTS TO PARTNERSHIP ORDINARY NET INCOME OR (LOSS) FARMERS CATTLE COMPANY
* * * (a) On March 28, 1973, you wrote a check payable *329 to Chancellor Investitures Trust Account in the amount of $198,632.00, and deducted this amount as feed expense on Schedule F of your return for the period ending March 31, 1973. It is determined that this payment does not represent a proper deduction in the year ended March 31, 1973, inasmuch as it represents a security deposit for the eventual purchase of feed, and was not expended for feed in that year. Accordingly, it is disallowed for the year ending March 31, 1973, but is allowed in the following year, when this amount was, in fact, expended for feed or other deductible expenses. * * * (c) It is determined that two bank drafts totaling $150,000.00 which were written and drawn on your draft account on March 28, 1974, to two different suppliers--Jones L.S. Feeding Co., Eden, Idaho, and Uhlig Feed Lots, Inc., Hansen, Idaho--represent advances to these firms which were credited against monthly feed bills for periods ending April 15, 1974, and May 15, 1974. As such, the $150,000.00 represents prepayment of expenses for which a business purpose for such prepayment has not been established. The portion of feed expenses consisting of this $150,000.00 amount is disallowed. *330 Farmers Market of Northern California (FMNC)
* * * (b) You claimed a deduction of $499,836.00 for the year ended March 31, 1972, for an amount designated as a credit guarantee fee; this represents an amount accrued but not paid, payable to Walter Fong for his personal guarantee of accounts payable to your suppliers. Mr. Fong is your president and is a shareholder in your corporation.It is held that this amount is not a deductible expense, since it has not been established that there is a definite and fixed liability to pay all or any portion of this amount to Mr. Fong. It is also held that this amount is not a deductible expense because you have failed to establish the reasonableness of the amount or the ordinary and necessary nature of the deduction. Furthermore, it is held that this amount is not deductible under the provisions of section 267 of the Internal Revenue Code, since it is held that Mr. Fong owns directly, indirectly, or constructively, over 50 percent of your stock, and this amount was not paid within two and one-half months of the close of the taxable year in which it was claimed as a deduction. (c) Due to adjustments to income of the *331 partnership, Farmers Management Service Company, as outlined in detail in Exhibit A, your taxable income is increased by $463,072.00 for the year ended March 31, 1973, and by $339,362.00 for the year ended March 31, 1974, to reflect your distributive share of the partnership adjustments. Computation of the increase in your income is shown below: Taxable Year Ended March 31
1973
1974
Ordinary net income of partnership as
determined, per Exhibit A: Year Ended December 31, 1972
$140,561 Year Ended December 31, 1973
$250,320 Your distributive share of corrected income
71,686 90,116 Partnership loss claimed per return
(391,386)
(249,246) Increase in taxable income
$463,072 $339,362 * * * ADJUSTMENTS TO PARTNERSHIP ORDINARY NET INCOME OR (LOSS) FARMERS MANAGEMENT SERVICE COMPANY
Same explanation as for Farmers Market No. 5, Inc. * * * ADJUSTMENTS TO PARTNERSHIP ORDINARY NET INCOME OR (LOSS) FARMERS CATTLE COMPANY
Same explanation as for Farmers Market No. 5, Inc. Farmers Market of South Sacramento, Inc. (FMSS)
(a) You claimed a deduction of $394,425.00 for the year ended February 29, 1972, for an amount *332 designated as a credit guarantee fee; this represents an amount accrued but not paid, payable to Walter Fong for his personal guarantee of acounts payable to your suppliers. Mr. Fong is your president and is a shareholder in your corporation. It is held that this amount is not a deductible expense, since it has not been established that there is a definite and fixed liability to pay all or any portion of this amount to Mr. Fong. It is also held that this amount is not a deductible expense because you have failed to establish the reasonableness of the amount or the ordinary and necessary nature of the deduction. Furthermore, it is held that this amount is not deductible under the provisions of section 267 of the Internal Revenue Code, since it is held that Mr. Fong owns directly, indirectly, or constructively, over 50 percent of your stock, and this amount was not paid within two and one-half months of the close of the taxable year in which it was claimed as a deduction. (b) Due to adjustments to income of the partnership, Farmers Management Service Company, as outlined in detail in Exhibit A, your taxable income is increased by $151,848.00 for the year ended *333 February 28, 1973, and by $113,120.00 for the year ended February 28, 1974, to reflect your distributive share of the partnership adjustments. Computation of the increase in your taxable income is shown below: Taxable Year Ended Feb. 28
1973
1974
Ordinary net income of partnership as
determined, per Exhibit A: Year Ended December 31, 1972
$140,561 Year Ended December 31, 1973
$250,320 Your distributive share of corrected income
23,895 30,038 Partnership loss claimed per return
(127,953)
(83,082)
Increase in taxable income
$151,848 $113,120 (c) Taxable income for the taxable year ended February 28, 1974, is increased to reflect your distributive share of adjustments to the partnership income of Farmers Cattle Company for the partnership's taxable year ended March 31, 1973, as shown in Exhibit B, attached. Exhibit B also shows adjustments to the partnership income for the succeeding partnership year ended March 31, 1974; however, these adjustments do not affect the taxable years covered in this notice to you. The adjustment for the year ended February 28, 1974, is computed on the following page. ADJUSTMENTS TO PARTNERSHIP *334 ORDINARY NET INCOME OR (LOSS) FARMERS MANAGEMENT SERVICE COMPANY
Same explanation as for Farmers Market No. 5, Inc. * * * ADJUSTMENTS TO PARTNERSHIP ORDINARY NET INCOME OR (LOSS) FARMERS CATTLE COMPANY
Same explanation as for Farmers Market No. 5, Inc. Walter Fong and Yee Shee Fong
(a) It is held that you have additional reportable income for the taxable year ended December 31, 1972, in the amount of $1,237,731.00, by reason of constructive receipt of credit guarantee fees in that amount from three corporations of which you are president and a controlling shareholder. The credit guarantee fees are reportedly payable to you by virtue of your personal guarantee of accounts payable of these three corporations to their suppliers. The amounts accrued but not paid by the three corporations are as follows: Farmers Market of Northern California, Inc.,
taxable year ended March 31, 1972
$ 499,835.80      Farmers Market of South Sacramento, Inc.,
taxable year ended February 29, 1972
394,425.47      Farmers Market No. 5, Inc.,
taxable year ended March 31, 1972
343,470.15      Total
$1,237,731.00
[sic]
(b) On December 31, 1971, Farmers *335 Central Market Corporation accrued and deducted the amount of $20,000.00 as salary payable directly to you, and subsequently executed a note payable on demand at 8 percent interest on February 9, 1972. It is held that this note constitutes payment of the salary and is includible in your income in the year received, 1972. Since you did not report this $20,000.00 in income shown on your return, taxable income is increased by this amount. * * * (f) Taxable income is increased in each of the taxable years 1972 and 1973 to reflect your distributive share of adjustments to income of two small-business corporations and one partnership.The adjustments are summarized below: 1972
1973
(1) Farmers General Market Corporation
$ 2,672
$ 52,399
(2) Farmers International Market Corp.
498,000
18,844
(3) Farmers Management Service Company
282,801
Increase in taxable income
$500,672
$354,044
(1) Adjustments to income of the small-business corporation, Farmers General Market Corporation, are shown in detail in Exhibit A, * * *. Your taxable income is increased in 1972 and in 1973 to reflect your share of those adjustments, as follows: 1972
1973
Taxable income as corrected, Exhibit A
$156,427
$363,295
Your distributive share of corrected
taxable income
46,928
108,989
Amount reported per return
44,256
56,590
Increase in income
$ 2,672
$ 52,399
*336 (2) Exhibit B * * * details adjustments to the income of Farmers International Market Corp., a small-business corporation of which you are the sole shareholder. Due to these adjustments, your income is increased in 1972 and in 1973, as computed below: 1972
1973
Taxable income as corrected, Exhibit B
$ 15,025 $18,844
Your distributive share of corrected
taxable income -- 100 percent
15,025 18,844
Income or loss reported per return
(482,975)
Increase in income
$498,000 $18,844
(3) Due to adjustments to income for 1973 of the partnership, Farmers Management Service Company, in which you acquired an interest in 1973, your taxable income for 1973 is increased by $282,801.00; the adjustments to the partnership income are shown in Exhibit D.Although you were not a partner in the year 1972, the exhibit shows adjustments to partnership income for that year as well as for 1973, inasmuch as the adjustments for each year are related. 1972
1973
Ordinary net income of partnership
as corrected
$140,561
$250,320 Your distributive share of corrected income
75,096 Partnership loss claimed per return
(207,705)
Increase in income, 1973
$282,801 *337 ADJUSTMENTS TO TAXABLE INCOME FARMERS GENERAL MARKET CORPORATION
* * * (a) For the year ended December 31, 1973, you claimed a deduction of $80,000.00 for inventory fees in connection with the purchase of two grocery stores from Bazar, Inc. This $80,000.00, consisting of $40,000.00 per store, is in addition to a provision in the purchase contracts for specific costs for merchandise based on retail cost less standard discounts. It is held that the $80,000.00 represents cost attributable to goodwill, or the "going concern" value, and as such it is the cost of a nondepreciable intangible asset. Accordingly, the deduction claimed is disallowed and income is increased by $80,000.00. (b) During the year ended December 31, 1973, you acquired a total of six stores, two of which were purchased from Bazar, Inc., and four of which were new stores.You claimed a deduction of $15,000.00 for each store, for a fee paid to Farmers Enterprises, Inc. It is held that the services rendered by Farmers Enterprises, Inc., for which you paid the fees, result in the creation of a non-amortizable intangible asset, and are therefore capital expenditures and are not currently deductible expenses. *338 Income is therefore increased by $90,000.00 to reflect the disallowance of the new-store opening fees of that amount. * * * ADJUSTMENTS TO TAXABLE INCOME FARMERS INTERNATIONAL MARKET CORP.
(Small Business Corporation) * * * (a) For the year ended December 31, 1972, you claimed a deduction of $320,000.00 for inventory fees in connection with the purchase of eight grocery stores from Bazar, Inc. This $320,000.00, consisting of $40,000.00 per store, is in addition to a provision in the purchase contracts for specific costs for merchandise based on retail cost less standard discounts. It is held that the $320,000.00 represents cost attributable to goodwill, or the "going concern" value, and as such it is the cost of a nondepreciable intangible asset. Accordingly, the deduction claimed is disallowed and income is increased by $320,000.00. (b) During the year ended December 31, 1972, you acquired a total of nine stores, eight of which were acquired from Bazar, Inc., and one of which was a new store. You claimed a deduction of $15,000.00 for each store, for a total of $135,000.00, for a fee paid to Farmers Enterprises, Inc. It is held that the services rendered by Farmers *339 Enterprises, Inc., for which you paid the fees, result in the creation of a non-amortizable intangible asset, and the fees are thus capital expenditures and are not currently deductible expenses. Income is therefore increased by $135,000.00 to reflect the disallowance of the new-store opening fees of that amount. * * * ADJUSTMENTS TO PARTNERSHIP ORDINARY NET INCOME OR (LOSS) FARMERS MANAGEMENT SERVICE COMPANY
Same explanation as for Farmers Market No. 5, Inc. OPINION The first issue for decision is whether FMNC, FM No. 5 and FMSS are entitled to deduct credit guarantee fees payable to Mr. Fong which were accrued on their corporate books during their respective fiscal years ending in 1972. Respondent argues primarily that petitioners were not entitled to their claimed deductions because the credit guarantee fees were not ordinary, necessary and reasonable business expenses under section 162. Respondent further contends that the fees were not properly accruable by the corporations under section 461. In the alternative, respondent argues that if the fees were properly accruable under section 461, Mr. Fong owned over 50 percent in value of the stock of the three corporations, *340 and therefore the deductions should be disallowed under the attribution rules of section 267. As a final alternative argument, respondent contends that if we conclude that FMNC, FM No. 5 and FMSS are entitled to the claimed deductions for the credit guarantee fees, then Mr. Fong constructively received payment of the fees in 1972. Petitioners take the position that the credit guarantee fees were ordinary, necessary and reasonable currently deductible business expenses. They also contend that the fees were accruable under section 461 because they were definite and fixed liabilities. In response to respondent's first alternative argument, petitioners argue that Mr. Fong did not own over 50 percent in value of the stock of the store-operating corporations and therefore the attribution rules of section 267 do not preclude the deductibility of the claimed guarantee fees. Addressing respondent's final alternative argument, petitioners assert that Mr. Fong did not constructively receive income from the accrued guarantee fees in 1972; instead, they contend that he properly reported credit guarantee fee income upon his actual receipt of the money in 1977. If properly accrued, the credit *341 guarantee fees qualify as deductible business expenses under section 162 only if these expenses are ordinary, necessary and reasonable within the definitional standards applied by the courts. The term "ordinary" has not been defined to necessarily mean that the expense is one habitually or normally made by the particular taxpayer involved in the controversy. Rather, the courts have defined "ordinary" to include expenses commonly made in the type of business carried on by the taxpayer that are currently deductible and not capital expenditures. Deputy v. Du Pont,308 U.S. 488 (1940); Welch v. Helvering,290 U.S. 111 (1933); Tulia Feedlot, Inc. v. United States,513 F.2d 800, 804 (5th Cir. 1975). The Supreme Court and other courts have defined "necessary" to mean appropriate and helpful in the type of business carried on by the taxpayer. Lilly v. Commissioner,343 U.S. 90 (1952); Welch v. Helvering,supra.Additionally, section 162 requires that the amounts be reasonable based upon the taxpayer's type of business and particular circumstances. Tulia Feedlot, Inc. v. United States,supra at 804; *342 Limericks, Inc. v. Commissioner,165 F.2d 483 (5th Cir. 1948), affg. 7 T.C. 1129 (1946). Petitioners argue that payment of the credit guarantee fees were "necessary" because without them Mr. Fong would have discontinued his practice of personally guaranteeing their trade credit. Petitioners assert that without Mr. Fong's personal guarantees, suppliers would not have extended the trade credit which financially enabled them continually to acquire goods and merchandise. They contend that the credit guarantee fees were "ordinary" because suppliers generally require an oral or written personal guarantee before extending trade credit. Petitioners further assert that, in the corporate setting if the guarantor is a minority shareholder, as is the case here, the corporation typically compensates him for his potential risk. At trial, numerous experts testified on behalf of petitioners' position. The testimony at trial indicated that in the late 1960's and early 1970's, wholesale food distributors expected to obtain personal guarantees from retailers' proprietors or shareholders when the retailers' credit worthiness alone was considered highly risky. For *343 example, Mr. Fahey of Armour, Mr. Moore of MW, and Mr. Runyan of Fleming Company suggested that personal guarantees of corporate officers were required in high risk situations to deter a retailer's passing bad checks and to limit the supplier's financial vulnerability.Mr. Gray and others testified that the FM store-operating corporations had weak working capital positions and uncomfortably slim current and quick asset ratios. However, from the testimony of the suppliers' representatives, we neither conclude that they considered the FM store-operating corporations to be in the high risk category in 1971 and 1972 nor that Mr. Fong's personal guarantee was a requisite for continued dealings with the companies. In fact, Mr. Fahey stated that if Mr. Fong were to have withdrawn his personal guarantee, Armour likely would have continued to supply the stores and to extend trade credit to the FM store-operating corporations. Even if Mr. Fong's personal guarantees were helpful to petitioners, the question here is whether the credit guarantee fees paid to Mr. Fong were ordinary and necessary in petitioners' type of business. Although there is no direct testimony respecting the willingness *344 of other FM corporations' shareholders to act as guarantors regardless of whether guarantee fees were or were not available, petitioners seem to assume that either they would have been unwilling to do so or their guarantees would not have been helpful. There is testimony that, as a guarantor, Mr. Fong expressed concern about his potential personal liability if the corporations defaulted on their trade credit obligation and that he requested payment for his financial exposure. However, these facts alone do not establish that payment of the fees was helpful to petitioner-corporations. The record does not contain evidence to show that the fee payments were appropriate, helpful and of a common or frequent occurrence in the grocery business generally. Petitioner-corporations offered no evidence that other supermarkets or grocery chains paid similar guarantee fees to guarantors of their trade credit. They further failed to present evidence to show that payment of guarantee fees historically was normal in their own operations. The record is clear that for approximately 10 years Mr. Fong had never requested that such fees be paid and that during those 10 years petitioners had never *345 paid such fees to Mr. Fong or anyone else. [21]
Futhermore, the record here shows that, at no time, did any of the store-operating companies actually inquire whether a supplier would accept an alternative to Mr. Fong's personal guarantees. The testimony indicates that if the store-operating companies had attempted to negotiate other arrangements, suppliers likely would have continued to furnish goods without Mr. Fong's guarantee. The record is clear that Mr. Fong never, either before or after the voting of the guarantee fees, was required to pay any amount under his guarantee. Petitioners have the burden of proving that respondent was incorrect in disallowing the claimed deductions. Welch v. Helvering,supra. *346 Because petitioners have failed to show that the guarantee fees were ordinary and necessary within the meaning of section 162, we conclude that they are not entitled to their claimed deductions for the guarantee fees. Because we have found that the guarantee fees were not ordinary and necessary business expenses under section 162, we need not discuss respondent's other arguments concerning whether the fees were accrued properly under section 461, whether the attribution rules of section 267 preclude the deduction, and whether the fees were constructively received by Mr. Fong in 1972. The second issue for decision is whether the Commissioner is entitled under section 446 to require FMSC to change from the cash method to an accrual method of accounting or, in the alternative, whether FMSC constructively received the payments of the management fees in the year those fees were earned. Respondent argues that although FMSC is a service organization, it is not entitled to utilize the cash method of accounting. Respondent further asserts that FMSC's reported income and losses were distorted. He argues that FMSC's cash method of accounting in combination with its billing cycle resulted *347 in a disproportionate amount of losses in 1972 and 1973 because there was no true matching of revenues and expenses. In the alternative, respondent contends that if the cash method of accounting was appropriate, FMSC constructively received income in 1972 and 1973 that would offset its claimed losses. On the other hand, FMSC contends that it was entitled to utilize the cash method of accounting and that it did not constructively receive unreported amounts of income in 1972 and 1973. In the alternative, petitioner argues that if it should have utilized an accrual method of accounting, under the terms of its contracts with the FM store-operating corporations, its expenses and income were accrued in the appropriate years. Prior to September 1, 1972, the store-operating corporations employed their own grocery store managers. After that date, store managers were employed and paid directly by FMSC. The store-operating corporations, which were partners in FMSC, agreed by written contract to hire the store managers from FMSC. Under each contract, FMSC agreed to employ and to pay the store managers and certain store expenses in exchange for reimbursement and a 10 percent profit. Each *348 contract specified FMSC's billing procedure. FMSC agreed to provide the services of the store managers for the final 4 months of 1972 and promised to bill the store-operating corporations for these services within 60 days after the close of the calendar year. The store-operating corporations had 30 days thereafter to pay the submitted bills. Commencing the first quarter of 1973 and for all subsequent quarters, the same billing procedures applied. FMSC agreed to bill the store-operating corporations within 60 days after the close of the quarter in which the services were performed; the store-operating corporations agreed to pay the submitted bills within 30 days. On brief, respondent admits that generally the cash method of accounting is permissible for service organizations; however, respondent states that a taxpayer's method of accounting must clearly reflect its income. Respondent contends that under section 446 if a taxpayer uses an accounting method which fails to clearly reflect its income, respondent has discretion to require that the taxpayer change its method of accounting. Respondent asserts that his exercise of this discretionary power is justified in the instant *349 case. He suggests that usage of the cash method of accounting by FMSC "insures a large loss for tax purposes despite an actual 10 percent profit. The unavoidable conclusion is that the cash method of accounting fails to clearly reflect income." Relying upon Thor Power Tool Co. v. Commissioner,439 U.S. 522 (1979), and Brown v. Helvering,291 U.S. 193 (1934), respondent states that a taxpayer must make a clear showing that respondent has abused his discretion in requiring the taxpayer to change its accounting method. Petitioner argues that under section 446 a taxpayer is free to select a method of accounting and that in the instant case the cash basis method was an appropriate election. For support, FMSC states that it was a service business and that typically service businesses utilize the cash basis for "ease in accounting." FMSC further asserts that its billing cycles conformed to business realities and were backed by sound business reasons.Moreover, petitioner argues that even if an accrual method of accounting were appropriate, under the "all events" test it is the billing date which fixes the right to income and its amount. Thus, petitioner *350 asserts that the income in question was reported in the proper year. Section 446(a) and section 1.446-1(a)(1), Income Tax Regs., provide that taxable income is to be computed by a taxpayer under the method of accounting regularly utilized in keeping its books. Under the cash receipts and disbursements method, income is to be included in the taxable year in which actually or constructively received while expenditures are deducted in the taxable year in which actually made. Under an accrual method, income is included in the taxable year when all events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy; deductions are allowable in the taxable year in which all events have occurred which establish the fact of the liability that gives rise to the deduction and the amount can be determined with reasonable accuracy. Section 1.446-1(c)(1)(i) and (ii), Income Tax Regs.Section 451 provides the general rule for inclusion of gains, profits and income. Section 1.451-1(a), Income Tax Regs., explains that under an accrual method of accounting, in the case of compensation for services-- no determination can be made as *351 to the right to such compensation or the amount thereof until the services are completed, the amount of compensation is ordinarily income for the taxable year in which the determination can be made. * * * Section 1.451-2(a), Income Tax Regs., states that-- Income although not actually reduced to a taxpayer's possession is constructivey received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given. However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions. * * * FMSC chose the cash method of accounting for Federal income tax purposes. It maintained its corporate books and records according to the cash basis method. The contracts between FMSC and the store-operating corporations specified that with the exception of the period September through December 1972, FMSC would bill the store-operating corporations within 60 days of the close of each quarter. For the period September *352 through December 1972, FMSC was to bill within 60 days of the close of the calendar year. In all cases, the store-operating corporations promised to remit payments within 30 days. FMSC generally stayed within the parameters of that billing cycle, but, as later discussed, the store-operating companies did not at all times comply with the 30-day payment provision. Respondent argues that the billing cycle allowed FMSC to realize "artificial losses" for 1972 and 1973. It is clear that utilization of the cash method in combination with the agreed-upon billing cycle would result in expenses exceeding income in 1972. [22] However, this result does not mean either that FMSC's income was not clearly reflected or that the cash method is improper. Respondent seizes upon Mr. Gray's testimony that the cash method did not accurately match income and expenses pertaining to any given year. Respondent's argument is misplaced. Such matching is the purpose of accrual basis accounting and not of the cash method. An accounting method clearly reflects income if income is stated with as much accuracy as standard methods of accounting practice permit, Caldwell v. Commissioner,202 F.2d 112, 115 (2d Cir. 1953), *353 affg. a Memorandum Opinion of this Court, and the books are kept fairly and honestly; Osterloh v. Lucas,37 F.2d 277 (9th Cir. 1930), affg. 13 B.T.A. 713 (1928). There is nothing in the record that indicates that FMSC's books were kept inaccurately, unfairly or dishonestly. For these above reasons, we conclude that FMSC was entitled to use the cash method of accounting in the taxable years in issue. Respondent argues that if we should decide that the cash method was permissible, FMSC constructively received the management fees in the years earned rather than in the years actually received. In support of his argument, respondent asserts that FMSC's only bank account was the FM General Account shared with the various FM corporations, including FMNC, FMSS, and FM No. 5. Respondent urges that FMSC's ability to draw on the FM General Account gave it control over cash belonging or allocable to FMNC, FMSS, FM No. 5, or other FM corporations. Specifically, *354 respondent paints the picture that FMSC borrowed over $1 million in 1973 from FE which-- in turn borrowed from the store-operating corporations which owed FMSC the money in the first place. This circular arrangement should be ignored in favor of treating FMSC as having received the payments owed by the store-operating corporations in the years such payments were earned. FMSC's corporate records indicate that its cash flow picture might have required FMSC to borrow funds in order to pay its expenses. [23] However, the evidence shows that financial records were kept to maintain the separateness of the various FM corporations. It appears that where FMSC drew funds from the FM General Account in excess of its allocable share, records were maintained on the transaction and the borrowed funds were returned. *355 The record does show that for the third quarter of 1973, FMSC billed the FM companies on October 31, 1973, but the operating companies did not pay this bill until sometime in 1974. If this bill had been paid 30 days after the billing, it would have been paid in 1973. Even if the bill had not been sent until 60 days after the close of the third quarter of 1973 and payment had been made 30 days thereafter, payment would have been made in 1973.There is no showing in this record that there were not sufficient funds in the FM General Account allocable to the store-operating companies to pay the bill for the third quarter of 1973; the record also does not indicate why payment was delayed. On the basis of this record, we conclude that the payment for the third quarter of 1973 was readily available to FMSC before the end of 1973 and FMSC merely chose not to be paid. We therefore conclude that in 1973 FMSC constructively received payment for the third quarter of 1973. We further conclude that in 1972 FMSC did not constructively receive payment for the 1972 services billed. By amended answer respondent alleged that the corporate partners of FMSC had in effect changed their method of *356 accounting without the Commissioner's approval. Respondent states on brief that "this issue [is raised] because the effect of FMSC's election of the cash method of accounting is to give FMSC's corporate partners double deductions." Respondent explains that FMNC, FMSS, and FM No. 5 utilized an accrual method of accounting and that after September 1, 1972, on their corporate books, they accrued the expenses of management services of FMSC plus a 10 percent profit. At the same time, the store-operating corporations sought to deduct the FMSC losses attributable to the store-operating corporations' failure to pay FMSC for those management services.Respondent has the burden of proof with regard to this affirmative allegation. Rule 142(a), Tax Court Rules of Practice and Procedure.
We conclude that respondent's position does not have merit. While the store-operating corporations may have benefited from FMSC's using the cash method of accounting, the corporations maintained their separate identify from FMSC. We are of the opinion that respondent has failed to prove that such a benefit is tantamount to an unauthorized change in method of accounting.Thus, we conclude that respondent *357 has failed to meet his burden of proof with respect to this alternative issue. The third issue for decision is whether FCC is entitled to deductions under section 162 for prepaid cattle feed expenses of $198,362 in 1973 and $150,000 in 1974. FCC, a partnership with corporate partners FMNC (50 percent), FM No. 5 (35 percent), and FMSS (15 percent), utilized the cash basis of accounting and had a taxable year ending March 31. FCC claimed deductions for cattle feed expenses of $233,714 in its initial fiscal year ending March 31, 1973, and $1,242,693 in its fiscal year ending March 31, 1974. On February 13, 1973, FCC entered into a contract with Uhlig under the terms of which Uhlig agreed to feed and care for cattle owned by FCC. Because Uhlig was concerned that FCC might not "comply with the terms of this contract to the extent of assuring payments for cattle that Armour will have to place in other lots for feeding * * *, [Uhlig requires] prepayment * * * [from FCC] as a condition of entering into any agreement to feed cattle." The contract further provided that "as security" for payment of the feed costs and for a service charge per tonnage of feed fed, FCC promised to deposit *358 $198,632 into the Trust Account. The contract further specified that Uhlig should bill the trustees, Mr. Stein and Mr. Gray, on the 15th of each month and the trustees should make payments from the Trust Account within 10 days thereafter. The contract terms provided that if the Trust Account were depleted prior to termination of the agreement between Uhlig and FCC, FCC promised to replenish it; however, if the agreement terminated or expired with funds remaining in the Trust Account, the trustees would return the balance to FCC. Paragraph 3 of the February 13, 1973, contract set forth the cost of feed formulation to be utilized for billing purposes; a feed price was not specifically set. The price formulation was specified as Uhlig's weighted average cost per hundred weight of ingredients based upon actual purchase price per hundred weight paid by Uhlig; a service charge of $10 per ton of feed actually fed was also applied. FCC deposited $198,632 into the Trust Account on March 27, 1973. From February 16, 1973, through August 15, 1973, Uhlig incurred feed costs on behalf of FCC's "Operation One" as follows: Feed Lots
Charley
Frank
Ray
Bob
Mixed
Mixed
Mixed
Mixed
1973
Feed
Silage
Feed
Silage
Feed
Silage
Feed
Silage
2/16 to
3/15
$65.00
$12.00
$65.00
$12.00
$65.00
$12.00
3/16 to
4/15
65.00
12.00
65.00
12.00
65.00
12.00
66.80
14.00
4/16 to
5/15
65.00
12.00
65.00
12.00
65.00
12.00
66.80
14.00
5/16 to
6/15
65.00
14.00
65.00
14.00
65.00
14.00
70.00
14.00
6/16 to
7/15
65.00
16.00
65.00
16.00
65.00
16.00
73.46
16.00
7/16 to
8/15
65.00
16.00
65.00
16.00
65.00
16.00
83.60
16.00
*359 Prior to the end of FCC's fiscal year ending March 31, 1973, feed was consumed by FCC's cattle in the following amounts: Feed Bill Period
Lot
Amount
2/16/73 to 3/16/73
Charley
$ 6,298.14
2/16/73 to 3/16/73
Frank
19,260.84
2/16/73 to 3/16/73
Ray
9,582.46
3/16/73 to 4/15/73
Bob
1,955.19
3/16/73 to 4/15/73
Charley
3,639.28
3/16/73 to 4/15/73
Frank
10,312.38
3/16/73 to 4/15/73
Ray
6,871.19
Feed expense for feed consumed as of 3/31/73
$57,919.48
On July 23, 1973, FCC and Uhlig entered into another contract whereby Uhlig promised to feed and to care for FCC's cattle from October 1, 1973, to March 30, 1974. The contract terms were essentially identical to those of the prior contract; that differences involved the amounts FCC agreed to pay Uhlig. FCC agreed to pay the cost of feed plus a service charge of $12 per ton of feed actually fed plus $4 per ton of haylege actually fed.FCC agreed to deposit $200,000 into the Trust Account. [24]
By draft dated March 28, 1974, FCC transferred $75,000 directly to Uhlig. This transfer was not mentioned in the July 23, 1973, contract. *360 Uhlig treated this amount as a "feed advance" on its April 16, 1974, bill to FCC. On the April bill, the feed advance was applied to and exceeded the charges; thus, an "advance balance" was carried forward and applied against the charges on its May 16, 1974, bill. On August 14, 1973, FCC and Jones entered into a cattle feeding contract substantially the same as the July 23, 1973, contract with Uhlig. On March 28, 1974, FCC transferred $75,000 directly to Jones; this payment was not required by the August 14, 1973, contract. Jones treated the $75,000 as an "advance" received on April 1, 1974. This amount exceeded the charges for March 16, 1974, through April 15, 1974; thus, Jones credited the balance to the charges which appeared on its May 17, 1974, bill. Of the $75,000 that each received, Uhlig applied $21,677.61 and Jones applied $14,610 to the purchase of feed consumed by FCC's cattle prior to March 31, 1974. The remainder of the $75,000 checks were spent prior to May 15, 1974, to purchase feed. Respondent argues that the $198,632 deposit into the Trust Account was a nondeductible "security deposit." By amendment to his answer, respondent raised the argument that FCC *361 had not relinquished control over the $198,632 upon its transfer to the Trust Account since the trustees and account signatories were Mr. Gray and Mr. Stein, both of whom were involved in establishing and maintaining FCC's experimental feed program. Furthermore, with regard to the 1974 claimed deduction, respondent argues that FCC was not entitled to deduct the two $75,000 payments because the amounts constituted prepayment of expenses for which there was no business purpose. Petitioner FCC contends that the $198,632 was not a security deposit but rather a prepayment for cattle feed. Petitioner argues that the amount was irrevocably set aside in trust for Uhlig and that the full amount is deductible in its fiscal year ending March 31, 1973. In the alternative, petitioner contends that if we should conclude that the entire $198,632 was not deductible, the portion of that amount which represents feed actually paid for and consumed by FCC's cattle prior to March 31, 1973, ($57,919.48) is deductible. With regard to the two $75,000 direct payments in 1974, petitioner argues that those amounts were utilized by Uhlig and Jones to purchase feed at favorable prices at harvest time; petitioner *362 asserts that this constitutes an adequate business purpose for characterizing the expenditures as deductible business expenses. [25]
As a general rule, a cash basis farmer is entitled to treat payments for the purchase of livestock feed as a business expense deductible in the year paid. Commissioner v. Van Raden,650 F.2d 1046 (9th Cir. 1981), affg. 71 T.C. 1083 (1979); sections 1.162-12(a) and 1.461-1(a)(1), Income Tax Regs.[26] However, whether expenditures for feed made in the year prior to consumption of the feed are considered payments or security deposits depends upon a variety of factors. Amongst the factors that the courts have considered are (1) whether the payment is refundable, (2) whether the expense includes an amount for services to be rendered, (3) whether the taxpayer had a feed shortage, (4) whether good business reasons exist for prepayment, and (5) whether the feeder *363 required an advance payment, Shippy v. United States,308 F.2d 743 (8th Cir. 1962); Lillie v. Commissioner,45 T.C. 54 (1965); Ernst v. Commissioner,32 T.C. 181 (1959). See also discussion of these cases in Mann v. Commissioner,483 F.2d 673 (8th Cir. 1973), revg. a Memorandum Opinion of this Court; and discussion in Lillie v. Commissioner,supra at 59-60, of Cravens v. Commissioner,272 F.2d 895 (10th Cir. 1959), revg. 30 T.C. 903 (1958). In Ernst v. Commissioner,supra at 186, *364 we considered a deposit to be nonrefundable where the taxpayer was "irretrievably out of pocket the amounts paid, which amounts were obviously expenses incident to carrying on a trade or business." The courts have described good business reasons for prepayment of feed expenses to include the ability to obtain feed at a lower cost or at a cost-certain, to obtain preferential delivery of feed, to avoid a distress sale, etc. Lillie v. Commissioner,supra at 62-63. We must determine from all the facts and circumstances whether FCC's payment of $198.632 into the Trust Account on behalf of Uhlig and the $75,000 payments made directly to Uhlig and Jones were deductible advance feed payments or nondeductible security deposits. With regard to the $198,632 expenditure, we are of the opinion that FCC was not entitled to deduct the full amount in 1973. It is clear from the terms of the February 13, 1973, contract that FCC was not "irretrievably out of pocket" $198,632. The contract specified that if upon its termination or expiration any portion of the $198,632 remained in the Trust Account the balance would be returned to FCC. It was within FCC's unilateral power *365 to terminate the contract if it was dissatisfied with the care provided to its cattle. Furthermore, the contract provided that Uhlig required a $198,632 "security deposit" to protect it against the risk of future nonpayment by FCC and to cover both feed costs and a $10 service charge per tonnage of feed actually fed. We conclude that this $10 service charge constituted compensation for services to be rendered by Uhlig in caring for and feeding FCC's cattle; it did not appear to be a part of the actual costs of acquiring cattle feed. Moreover, petitioner has failed to show the existence of an underlying good business reason for prepayment of the $198,632. The only reason for the prepayment stated at trial was Uhlig's decision that it should not enter into the contract without FCC depositing $198,632 into the Trust Account. This testimony does not illustrate that the amount was not a security deposit. Petitioner argues that if the entire $198,632 is not deductible in 1973, then the $57,919.48 portion representing payment for feed consumed prior to March 31, 1973, should be deductible. We agree with petitioner. It is clear from the record that $57,919.48 of feed was consumed by the *366 FCC cattle prior to March 31, 1973. Moreover, the trustees utilized $57,919.48 of the $198,632 in the Trust Account to pay Uhlig for the feed purchased for pre-March 31, 1973, consumption. Once an amount from the Trust Account had been utilized to pay for feed, that amount was no longer refundable to FCC. We therefore conclude that in 1973 petitioner was entitled to deduct $57,919.48 for advance feed payments and that the balance was a nondeductible security deposit. We are of the opinion that FCC was entitled to deduct the entire $150,000 claimed as deductible advance feed costs for its fiscal year ending March 31, 1974. The record indicates that FCC had a reasonable business purpose for making the payments and that the payments were not merely deposits. Armour had borrowed some of the FCC feed. This left FCC without sufficient feed for its cattle. Uhlig and Jones purchased the required additional feed in part with the funds irretrievably given to Uhlig and Jones by FCC. [27] We consider the two $75,000 payments to be deductible in the years paid under the criteria heretofore discussed. *367 The next issue is whether fees in the amounts of $320,000 and $80,000 which were incurred by FMIC and FGMC, respectively, in connection with the purchase of new grocery stores from Bazar and Cal are currently deductible business expenses or should be capitalized as nonamortizable going concern value. The contracts between FIMC and FGMC and Bazar and Cal did not specifically allocate any portion of the purchase price to goodwill or going concern value. Petitioners take the position that the fees are a part of FIMC's and FGMC's costs of goods sold because the fees were incurred in obtaining inventory. Respondent contends that the fees represented costs attributable to going concern value of the acquired stores and thus constitute nondepreciable intangible assets. As distinguished from goodwill, [28] going concern value is "in essence, the additional element of value which attaches to property by reason of its existence as an integral part of a going concern." VGS Corp. v. Commissioner,68 T.C. 563, 591 (1977); Conestoga Transportation Co. v. Commissioner,17 T.C. 506, 514 (1951). Going concern value "is bottomed on the ability of the acquired business *368 to generate sales without any interruption because of the takeover." Winn-DixieMontgomery, Inc. v. United States,444 F.2d 677, 685, n.12 (5th Cir. 1971). Continuity of function and generation of sales without interruption upon the change of ownership is generally the result of such factors as (1) the existence of a network of regular customers and the expectation that their patronage will continue, (2) a staff of trained employees, (3) an established routine for supplying goods and services, (4) a product line ready for sale, and (5) equipment ready for immediate use. Northern Natural Gas Co. v. United States,470 F.2d 1107, 1109-1110 (8th Cir. 1973); Winn-Dixie Montgomery, Inc. v. United States,supra; Computing and Software, Inc. v. Commissioner,64 T.C. 223 (1975). [29] A company need not be profitable to have going concern value; it may operate at a loss and still have going concern value. Computing and Software, Inc.,supra at 235. *369 In the instant case, the terms of the contracts between both petitioners (FIMC and FGMC) and Bazar and Cal were essentially the same.Section 12 of the contracts stated that Bazar and Cal agreed to "close each store and terminate the employment of all * * * employees at the store as of the close of business on the Saturday immediately preceding the * * * opening day of the stores under petitioners' names and operations." Section 1 recited that petitioners agreed to purchase the sellers' merchandise, inventory, supplies, fixtures and equipment. Section 2 of each contract listed the purchase price to include the sum of the following: [30]
(a) Merchandise Inventories and Supplies The purchase price for the merchandise inventories and supplies located at the stores shall be an amount equal to the total of: (i) Sellers' cost of supplies; (ii) Sellers' retail sales price for packaged meat less 22 percent and Sellers' retail sales price for packaged delicatessen items less 25 percent; (iii) Sellers' cost for unpackaged (i.e. carcass) meats; (iv) Sellers' retail sales price for produce less 30 percent; (v) Sellers' retail sales price for all nongrocery items less 25 percent *370 ("nongrocery" items shall be those items on a list heretofore reviewed and initialed by representatives of Sellers and Purchaser); (vi) Sellers' retail sales price for all other merchandise inventory items less 17-1/2 percent; and (vii) The sum of * * * representing an agreed value of $40,000 per store with respect to the merchandise inventory at each store for purchasing, storage, handling, unloading, stocking of shelves and pricing and other labor costs. (b) Equipment and Tenant's Interests: The purchase price for the fixtures, equipment and the tenant's interest referred to in Section 1(c) shall be the sum of * * *. The issue here specifically involves the $40,000 stated amount found in Section 2(a)(vii). At trial, Mr. Gray explained that he negotiated the $40,000-per-store amount. He indicated that *371 from his point of view the $40,000 represented the cost of petitioners' obtaining the inventory of the acquired stores and of having Bazar's personnel remove the Bazar private label from items located on the store shelves. Mr. Gray further testified that FIMC and FGMC purchased the stores because Bazar and Cal no longer were interested in operating stores in the Sacramento area; the store locations had proved to be unprofitable. Mr. Gray stated that after petitioners purchased and operated the grocery stores for a period of time, they had no better economic luck with the acquired stores than had Bazar and Cal.
Applying these various facts to the key concepts for determining whether an acquired business has going concern value--continuity of function and generation of sales without interruption--we conclude that the purchase price paid by petitioners included a certain amount of going concern value. Petitioners successfully acquired the stores and opened them to customers without any significant time lapse. Section 12 of the contracts provided that Bazar and Cal would close the stores on Saturday and that petitioners woud reopen the grocery stores in operating condition on the *372 following Monday; the testimony reveals that petitioners consistently achieved this goal. Petitioners acquired from Bazar and Cal a network of their old customers and purchased their merchandise, supplies, fixtures and equipment. The contracts' terms are clear that the $40,000 payment per store which is in issue did not involve the actual cost of the purchase of inventory or equipment; those costs were listed separately. The contracts recited that the $40,000 payment per store was a reimbursement for the cost of labor in handling, unloading, stocking shelves and repricing goods for sale. In essence, we consider these payments to represent the purchase of the final product of the labors of Bazar's and Cal's trained staffs. This purchase enabled petitioners to continue operations of the acquired stores without interruption. Although petitioners did not hire Bazar's and Cal's trained staffs and they did not purchase Bazar's and Cal's lines of products to sell under the Bazar or Cal label, we are of the opinion that these two factors neither control nor negate our conclusion. Because the contracts failed to make an allocation of a portion of the purchase price to going concern *373 value and because petitioners have failed to show that respondent's determination regarding the $40,000 payments is erroneous, we conclude that the $320,000 and the $80,000 incurred by FIMC and FMGC, respectively, represent nonamortizable going concern value. The next issue for decision is whether "special opening service" fees in the amounts of $135,000 and $90,000 incurred by FIMC and FGMC, respectively, in connection with opening new stores should be capitalized as nonamortizable capital expenditures. Respondent takes the position that these "special opening services" are of a nonrecurring nature intended to result in a business advantage extending into the indefinite future and thus are nonamortizable intangible assets. He does not question the reasonableness of the amounts of the fees. On the other hand, petitioners argue that these expenses represent expenditures for management services from which the new stores benefit only on a short-term basis. Thus, petitioners contend that the amounts should be currently deductible business expenses. The line between nondeductible capital expenditures and currently deductible expenses often is difficult to draw. To qualify as a deduction *374 allowable under section 162(a), an expenditure must be paid for or incurred during the taxable year in carrying on a trade or business and it must be ordinary and necessary. In discussing a capital expenditure, the Supreme Court stated that-- the presence of an ensuing benefit that may have some future aspect is not controlling; many expenses concededly deductible have prospective effect beyond the taxable year. [To be considered a capital expenditure] [what] is important * * * is that the * * * payment serves to create or enhance for [the taxpayer] what is essentially a separate and distinct additional asset * * *.[Commissioner v. Lincoln Savings and Loan Assn.,403 U.S. 345, 354 (1971).] As listed in the separate contracts between FEI and FGMC and FEI and FIMC and as described in the testimony at trial, "special opening services" included: (1) Advice-- (a) placement of inventory, (b) proper inventory, (c) management of space, systems and controls, (d) pricing policies, (e) purchasing policies, (f) physical installation of inventory, (g) creation and implementation of advertising programs for opening stores. (2) Hiring employees. *375 (3) Supervising labor necessary to open stores. (4) Assistance and coordination in the pre-opening period. (5) Long-term management, purchasing, planning and construction of new facilities. (6) Negotiating for the purchase of facilities and equipment. The contracts deemed the "special opening services" as "aside from the normal management services and produce-warehouse services" that FEI promised to provide otherwise. We are of the opinion that the facts here show that fees expended by FIMC and FGMC for the "special opening services" were properly deductible as claimed.Although some of the expenses may have been of a norecurring nature and likely would provide some future business benefits to the grocery operations, they did not serve to create or enhance a separate asset for petitioners. The record shows that the fees incurred for the "special opening services" were appropriate, helpful and ordinary in petitioners' businesses. Therefore, we conclude that FIMC and FGMC are entitled to their respective claimed deductions. The next issue for decision is whether interest payments made by Mr. Fong in the amounts of $70,228 in 1972 and $36,736 in 1973 to FMSC are includable *376 in the income of FMSC in the years of Mr. Fong's payments. We previously determined that FMSC properly utilized the cash method of accounting in the years in issue. Based upon this determination, respondent argues that the interest payments were actually or constructively received by FMSC in the years that the payments were deducted by Mr. Fong and that they should have been reported as income in those years. Petitioners assert that the income should be reported in the years following Mr. Fong's payment because FMSC deposited the interest checks into its bank account in those subsequent years. Mr. Fong paid $70,228 of interest to FMSC by two checks, both dated December 27, 1972; at the direction of Mr. Fong, Ms. Leong signed the checks on his behalf. FMSC deposited the checks into its bank account on January 2, 1973. On December 28, 1973, Mr. Fong paid $36,736 interest by checks; FMSC deposited the checks into its account on January 2, 1974. Ms. Leong signed all checks at the Farmers Markets offices at 401 S. Street, Sacramento, California, the same business address utilized by FMSC. Respondent asserts that the checks were actually or constructively received by FMSC on the *377 same date as written because the business locations were identical and because of Mr. Fong's interest in and control over FMSC. Relying upon Kahler v. Commissioner,18 T.C. 31 (1952), respondent argues that where a check that has no substantial restrictions on its negotiability is actually received by a cash basis taxpayer prior to the end of its taxable year and the check actually is honored by the bank in a subsequent tax year, income is reportable in the year the check was received. Moreover, citing Kunze v. Commissioner,19 T.C. 29 (1952), affd. per curiam 203 F.2d 957 (2d Cir. 1953), respondent suggests that if a taxpayer intentionally delays actual receipt of the check, the taxpayer is treated as having constructively received the check in the year in which it should have been received if there had been no delay. Petitioner has the burden of proving that respondent's determination is incorrect. Welch v. Helvering,supra. We are of the opinion that petitioners have failed to meet their burden of proof. Settled case law provides that where a taxpayer receives checks to which are not attached substantial *378 restrictions on negotiability, it is the date of actual delivery or constructive receipt of the checks which establishes the proper taxable year to report the income; the year of deposit does not control. See, e.g., Kunze v. Commissioner,supra. The courts reason that without this rule, through his own volition a taxpayer might manipulate the reporting of realized income merely by delaying deposits of checks. At trial, petitioner, presented canceled checks; these showed the dates of their deposit. However, petitioner failed to introduce evidence that contravenes respondent's assertion that the year of actual delivery or constructive receipt was 1972 for the $70,228 and 1973 for the $36,736. It is clear that FMSC occupied the same office building in which the checks were written. It is reasonable to conclude, and we do conclude, from the evidence that the checks were actually delivered to FMSC on the date they were drawn. Certainly the only was it could be considered on the basis of this record that actual receipt did not occur is to assume that FMSC deliberately delayed delivery of the checks, in which event constructive receipt of the payments occurred in *379 the years that the checks were written. Therefore, FMSC should have included the $70,228 in its 1972 reportable income and the $36,736 in its 1973 reportable income. The next issue for decision is whether a $93,000 fee accrued in 1973 by FCMC was deductible as an ordinary and necessary business expense in that year. Respondent takes the position that the fee was not deductible under section 162.On brief, petitioner argues that the fee represented reinbursement to FCC for "past current expenses and losses" due to its assumption of the "responsibility for the ongoing experimental meat program in expanding its present business." Petitioner admits that the fee was not accrued pursuant to a written agreement, but contends that an agreement existed between FCMC and FCC. To support its position that the $93,000 was currently deductible, petitioner places its sole reliance on Mr. Gray's testimony. Mr. Gray's testimony does not persuade us that the fee was a currently deductible item. At trial, Mr. Gray surmised that the $93,000 was accrued in accordance with an oral agreement, but he was not sure of this and in effect admitted that he did not know what the amount represented. He testified *380 that he believed the fee consisted of a reimbursement for expenses and losses incurred by FCC on the first experimental feed operation plus estimated expenses and losses anticipated from the second experimental feed program plus $10,000. Petitioner did not introduce into evidence documents to support Mr. Gray's statements. We do not view Mr. Gray's testimony as a definitive statement which substantiates the need or purpose of the $93,000 fee. The next issue for decision is whether a $75,000 fee accrued by FCMC in 1973 and payable to FMSC by a promissory note was an ordinary and necessary business expense deductible in 1973. Respondent argues that petitioner did not establish that the $75,000 fee was ordinary and necessary or reasonable in amount. In the alternative, respondent contends that no bona fida indebtedness existed and that petitioner did not submit an explanation of the reason for the $75,000 promissory note. Petitioner argues that the fee represented a reimbursement to FMSC for amounts FMSC had paid FEI to provide legal and accounting expenses over an 18-to-24-month period with regard to ongoing plans to expand the FM grocery chain through franchise arrangements. *381 After a thorough review of the record, we are of the opinion that petitioner failed to offer sufficient evidence to substantiate the business need for and purpose of the $75,000 fee. The sole evidence introduced to support the claimed deduction was Mr. Gray's testimony that in his recollection the amount represented payment for legal and accounting fees. Mr. Gray's recollection of this did not appear acute and we do not believe that it is necessarily an accurate or a sufficient substantiation of the purpose of the $75,000 note. Therefore, we conclude that petitioner has not sustained its burden of proof as required by Welch v. Helvering,supra.
The final issue for decision is whether a $20,000 promissory note received by Mr. Fong in 1972 as salary from FCMC should have been included in his reported income in 1972. Mr. Fong received the promissory note on February 9, 1972; the note was payable on demand and bore an interest rate of 8 percent per year. Respondent argues that Mr. Fong failed to prove that the face value of the promissory note was not substantially equal to its fair market value and that therefore the $20,000 face value should have been reported *382 as income in 1972. Respondent additionally asserts that a demand note from a corporation to its president and controlling shareholder should be regarded as essentially equal to a corporate check, includable in the income of a cash basis taxpayer in the year of receipt. On the other hand, petitioner argues that because respondent made no determination as to the fair market value of the note, its inclusion in Mr. Fong's income at face value "is arbitrary and shifts the burden [of going forward with the evidence] to IRS." Petitioner further contends that the promissory note did not actually have an ascertainable value when received and thus should not be included in income. We agree with respondent that the full face value of the note should have been included in Mr. Fong's income for 1972. The burden is upon the taxpayer to show that a promissory note had no ascertainable fair market value when taken in lieu of cash in payment of his salary. Corbett v. Burnet,50 F.2d 492 (D.C. Cir. 1931); Marcello v. Commissioner,43 T.C. 168, 180 (1964), affd. 380 F.2d 499 (5th Cir. 1967). We are of the opinion that petitioner failed to make such *383 a showing. We hold that respondent's determination was not arbitrary and did not shift the burden of going forward with the evidence. The value that petitioner must include in his 1972 reportable income is the fair market value of the promissory note. From the evidence in the record, we conclude that FCMC was a solvent debtor in 1972 and could have paid Mr. Fong the face amount of the note on his demand. Petitioner states that FCMC would have risked possible insolvency if the promissory note actually had been paid in 1972. We recognize that FCMC's non-fixed assets nearly equaled its current liabilities on December 31, 1972, that its net worth increased from $78,308 on January 1, 1972, to $111,709 on December 31, 1972, and that FCMC had a negative working capital position; these measures of debt-paying ability do not change the fact that FCMC did not pay the promissory note and was solvent in 1972. We thus conclude that Mr. Fong's reportable income for 1972 must include the fair market value of the note. Because petitioner has not shown that the face value of the note was not essentially equivalent to its fair market value and because he has not shown that the note did not have *384 an ascertainable value in 1972, the full $20,000 should have been reported by him as income in 1972. In accordance with the foregoing, Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Art B. Fong, docket No. 7457-76; Samuel B. Fong, docket No. 7458-76; Mun Li Fong, docket No. 7459-76; Franklin Fong, docket No. 7460-76; Peggy Fong Wong, docket No. 7461-76; Stanley L. Wong and Peggy Fong Wong, docket No. 7462-76; Wanda Fong Toy, docket No. 7463-76; Sammy G. Toy and Wanda Fong Toy, docket No. 7464-76; Farmers Central Market Corp., docket No. 7465-76; Wal Noon Corp., docket No. 7466-76; Lee Yuen Enterprises (Hong Kong) Limited, docket No. 7467-76; Farmers Enterprises, Inc., docket No. 7468-76; Farmers Market No. 5, Inc., docket No. 7469-76; Farmers Market of Northern California, Inc., docket No. 7470-76; Farmers Market of South Sacramento, Inc., docket No. 7471-76; and Walter Fong and Yee Shee Fong, docket No. 7472-76.↩
2. Unless otherwise stated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years here in issue.↩
3. The purpose of LYE was to operate grocery stores in the United States and to invest in land development in Hong Kong.↩
4. For fiscal years 1970, 1971, and 1972 and the 2-1/2 months thereafter, the stock ownership in FMNC, FMSS and FM No. 5 were as follows: ↩
Farmers Market No. California
No./Shares
Suey Chew Fong
357
James Lau
1,627
Charles S. Wong
186
Walter Fong
1,527
Mun Li Fong
1,172
Lee You
464
Fong Suey Ying (aka Albert)
2,498
Moon Sun Fong (aka Jack Lee)
556
Jack Ball Fong
433
Fong Suey Young
124
Lay and Shue Wha Fong
803
Kenneth Fong
186
Gunk Ott Fong
247
Haw Gee
186
Jim Y. Louie
186
Phillip Ah Tye
278
Gong Yee Fong
247
Jack Louie
250
Johnny Fong
200
Farmers Enterprise
1,025
Fong Chew Lang
124
12,676
Farmers Market So. Sacramento
Kenneth Wong
50
Fong Suey Chew
50
Charles S. Wong
100
Leong Gum Dork
200
Ly Moon
200
Percy Lee
400
Jack B. Fong
300
Ho Yee
500
Walter Fong
3,300
James Lau
750
James Ghy Louie
100
Gung Ott Fong
50
Gail Fong
200
Fong Moon Sun
500
Mary Fong
400
Edward Woo
100
Edmund Gong
100
Jim Y. Louie
100
Farmers Market No. Cal.
500
Lay Fong
750
James K. Y. Fong
150
Kong Quong Gee
750
Farmers Market No. 5
3,000
Kay Fong
750
Gan Kwock Hom
375
Lyman Lee
300
Albert C. Lew
375
Yon Yee
225
Jack Louie
300
May Mee Yin Fong
100
George G. Louie
500
Farmers Enterprise, Inc.
500
15,975
Farmers Market No. 5
Lay Fong
1,000
Walter Fong
2,200
Kay Fong
1,500
Kong Quong Gee
500
Kim Yuen Chin (Soon Kim Yee)
500
Wing F. Wong (Huston Fong)
100
Fon Quong Wi
100
James K. Y. Fong
500
Percy Lee
200
Lily Fong
200
Loui Gim Kan (Hing Gong Louie)
500
James Y. Lau
100
Linda Fong
500
Henry F. Gon
100
Farmers Enterprise
300
Kwong Shew Wai
100
Jack Louie
250
Mrs. Walter Fong
200
Leong Gum Dork
200
Poy K. Louie
300
Noon Kwee Fong
150
Fon Gok Ming
200
David Fong
200
9,900
5. Mr. Fong owned 70 percent of the stock of FCMC during the years here in issue. Mr. Fong owned 30 percent of the FGMC stock during the years here in issue, Mun Li owned 25 percent and their children 45 percent. FIMC, a subchapter S corporation in 1972, was 100 percent owned by Mr. Fong. ↩
6. Mr. Fong was paid $102,000, $117,250, $198,139, $441,822 and $258,100 by FE for the calendar years 1969, 1970, 1971, 1972 and 1973, respectively. ↩
7. FMSC, a partnership, was organized September 1, 1972. In 1972, the partners of FMSC were FMSS (17 percent), FMNC (51 percent), and FM No. 5 (32 percent). On January 1, 1973, Mr. Fong became a partner in FMSC and the partnership interests thereafter were FMSS (12 percent), FMNC (36 percent), FM No. 5 (22 percent), and Mr. Fong (30 percent). ↩
8. FCC, a partnership, was organized September 1, 1972, as a cash basis taxpayer with fiscal year ending March 31. In 1972, 1973 and 1974, the partners of FCC were FMNC (15 percent), FMSS (50 percent), and FM No. 5 (35 percent).↩
9. From 1962 through 1965 D. Herbert Gray worked with the accounting firm that serviced FM. During the early 1970's, he advised Mr. Fong on FM's financial matters. Mr. Gray described his position at that time as essentially a comptroller involved in the daily financial management of the FM corporations. He designed a more sophisticated accounting, payroll and billing system for the FM corporations and assisted in planning FM's expansion of its grocery store chain and auxilliary services. In approximately 1977, Mr. Gray became chief financial officer of FM. Thereafter, Mr. Gray purchased FM's assets. Soon thereafter, FM redeemed its outstanding stock from Mr. Fong and others.↩
10. The terms of the July 23, 1973, contract between FCC and Uhlig differed slightly from the February 13, 1973, contract in terms of duration period and charges. Pursuant to the February 1973 contract, Uhlig agreed to feed and care for FCC's cattle from February 1, 1973, to March 30, 1973. For these services, FCC agreed to pay Uhlig for the cost of cattle feed plus a service charge of $10 per ton of feed fed. Under the July 23, 1973, contract, Uhlig agreed to feed and care for FCC's cattle from October 1, 1973, to March 30, 1974. FCC agreed to pay Uhlig for the cost of feed plus a $12 service charge per ton of feed fed plus $4 per ton of haylage actually fed. ↩
11. The comparable paragraphs of the July 23, 1973, and the August 14, 1973, contracts provided: July 23, 1973-- THIS AGREEMENT, by and between FARMERS CATTLE COMPANY, a Partnership, and UHLIG FEEDLOTS, INC., a Corporation, incorporated in the State of Idaho provides as follows: 1. Between October 1, 1973, and March 30, 1974, Farmers Cattle Company will deliver to Feeder on its feedlot located at Hansen, Idaho, approximately 2,000 cattle.Farmers will pay to Chancellor Investitures, a partnership located at 3500 American River Drive, Sacramento, California, as Trustee, funds sufficient to purchase feed for the said cattle. Chancellor Investitures will deposit with the First Security Bank of Idaho the sum of $200,000.00 in Trust Account No. 1241-0006 03-00050-52, for said feed. * * * August 14, 1973-- THIS AGREEMENT, by and between FARMERS CATTLE COMPANY, a Partnership, and JONES LIVESTOCK FEEDING COMPANY, a Corporation, incorporated in the State of Idaho provides as follows: 1. Between September 15, 1973, and March 30, 1974, Farmers Cattle Company will deliver to Feeder on its feedlot located at Eden, Idaho, approximately 5,000 to 6,000 cattle. Farmers will pay to Chancellor Investitures, a partnership, located at 3500 American River Drive, Sacramento, California, as Trustee, funds sufficient to purchase feed for the said cattle. Chancellor Investitures will deposit with the First Security Bank of Idaho the sum of $500,000.00 in Trust Account No. 1241-0006 03-00050-52, for said feed. * * * ↩
12. The comparable paragraphs from the July 23, 1973, and August 14, 1973, contracts provide: July 23, 1983-- b. A service charge of $12.00 per ton of feed fed plus $4.00 for haylage fed. August 14, 1973-- b. A service charge of $12.00 per ton of feed fed plus $4.00 for haylage fed; $20.00 per ton for silage fed (no $12.00 service charge on silage).↩
13. Pursuant to the August 14, 1973, contract with Jones, on September 6, 1973, FCC transferred $96,800 to the Trust Account for the purchase of 4 million pounds of barley ($4.92 per hundred weight). ↩
14. The balance of Jones' corn and barley purchases were utilized by Armour to feed its cattle in accordance with a separate borrowing arrangement between Armour and FCC.↩
15. Suppliers' policies regarding the extension of credit differed. Some creditors required payment and check clearance within 7 days of delivery of the goods; others required payment and check clearance within 14 or 21 days. Suppliers of health and beauty aids generally negotiated a 90-day trade credit program. ↩
16. Because the various FM store-operating corporations failed to provide coompany financial statements to Armour, Armour relied upon Mr. Fong's personal financial statements when considering the credit worthiness of the stores.↩
17. Ruby Leong was responsible for Mr. Fong's personal books until 1972. Ms. Leong had authority to sign FM checks.↩
18. From 1970 through 1973 the following bank accounts were maintained: (1) FM general account, (2) a payroll account, (3) FMSC account, (4) several FCC accounts, and (5) FE account.↩
19. The effect of the billing cycle and payment schedules arranged between FMSC and the various FM corporations allowed approximately 16 to 18 weeks to lapse between the time FMSC would pay the store managers' salaries and the time that the FM corporations would reimburse FMSC.↩
20. FIMC and FGMC did not want to sell items showing a Bazar or Cal label.↩
21. The record shows that Mr. Fong's guarantee went to all the FM stores, not only those operated by the three corporations that accrued and deducted the guarantee fees. The record also shows that Mr. Fong was the major decision-maker for all FM stores and was paid a substantial salary for his services. The very fact that Mr. Fong could decline to furnish financial statements of the stores to suppliers is indicative of his control of the operations.↩
22. As hereinafter discussed, it is far from clear that this result would have occurred in the year 1973 if the store-operating companies had paid FMSC in accordance with the terms of their contracts.↩
23. The FMSC partnership return of income for 1973 indicates other current liabilities, payable to affiliates-- beginning of taxable year, $0; end of taxable year, $1,482,978. The 1973 income tax return for FE shows an accounts receivable from affiliates of $1,546,776 at yearend with a $0 receivable at the beginning of the year. This may mean that FMSC borrowed the funds from FE and that separate records were maintained.↩
24. The $200,000 deposit into the Trust Account is not at issue in this case.↩
25. FCC admits that a portion of its previously purchased feed was borrowed by Armour pursuant to a special arrangement. This transaction left FCC without sufficient feed for its cattle which resulted in FCC's need to purchase additional feed for its cattle.↩
26. See also Rev. Rul. 79-229, 1979-2 C.B. 210, superseding Rev. Rul. 75-152, 1975-1 C.B. 144↩, where the Internal Revenue Service indicated the proper taxable year in which a cash basis farmer is to deduct the cost of livestock feed. IRS took the position that when livestock consume feed in the year following the year that the taxpayer paid for the purchase of feed, the amount is deductible in the year of the payment if the payment is not merely a deposit, the prepayment has a business purpose, and the deduction does not result in a material distortion of income.
27. A portion of the purchased feed was not consumed by the cattle until after March 31, 1974.↩
28. The concept of goodwill is founded upon a "pre-existing business relationship, based on a continuous course of dealing," which may be expected to continue indefinitely. Skilken v. Commissioner,420 F.2d 266, 268 (6th Cir. 1969), affg. 50 T.C. 902 (1968); Computing and Software, Inc. v. Commissioner,64 T.C. 223, 233 (1975). It is the "expectation that 'the old customers will resort to the old place.'" Commissioner v. Killian,314 F.2d 852, 855 (5th Cir. 1963), affg. a Memorandum Opinion of this Court; Boe v. Commissioner,307 F.2d 339, 343 (9th Cir. 1962), affg. 35 T.C. 720 (1961); Computing and Software, Inc. v. Commissioner,supra↩ at 232. 29. See also Concord Control Inc. v. Commissioner,615 F.2d 1153 (6th Cir. 1980), affg. in part a Memorandum Opinion of this Court; Black Industries, Inc. v. Commissioner,T.C. Memo. 1979-61↩.
30. In the contract between FIMC and Bazar and Cal, the total purchase price additionally included an amount for the sale of hard liquor. This was not a part of the contract between FGMC and Bazar and Cal. In the contract between FGMC and Bazar and Cal, Section 2(b) set a purchase price different than that listed in the contract between FIMC and Bazar and Cal.↩